DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Ramini Sri Pilla, | ) | |
| | ) | CASE NO. 1:07 CR 228 |
| Petitioner-Defendant, | ) | (Civil Case No. 1:08 CV 31) |
| | ) | |
| v. | ) | <u>MEMORANDUM OPINION</u> |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent-Plaintiff. | ) | |
| | ) | |

(1:07 CR 228 and
 1:08 CV 31)

# Index

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.      The Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.      The Delayed Plea of Guilty to the Information

     C.      The Petitioner's Plea of Guilty to the Information Without Admitting to the
            Allegations in Paragraph 3(1) in the Information and the Court's Commentary . 4

     D.      A Review of the Transcript of the Guilty Plea . . . . . . . . . . . . . . . . . . . . . . . . . . .. 7

          1.      The Factual Basis Stated by AUSA Rowland in Support of the Guilty
               Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          2.      The Court's Relevant Questions to the Defendant Regarding her
               Anticipated Guilty Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

          3.      The Sentencing Computation as Discussed During the Guilty Plea
               Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          4.      The Deportation Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     E.      The Petitioner's Acceptance of Responsibility . . . . . . . . . . . . . . . . . . . . . . . . . .21

     F.      The Court's Sentence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

     G.      The Petitioner's Habeas Corpus Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.     The Petition for *Corum Nobis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.    Summary of the Government's Opposition to the *Corum Nobis* Petition . . . . . . . . . . . 26

IV.     The Court's Fact Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.      A Review of the Case Law Involving the Writ of *Corum Nobis* and Guilty Pleas
       in the Context of Potential Deportation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

(1:07 CR 228 and
 1:08 CV 31)

VI.    Does the Decision in *Padilla v. Kentucky* Constitute a New Rule In the Context of *Teague v. Lane* As Claimed by the Government? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

VII.   If the Court Assumes the Teachings of *Padilla v. Kentucky* Apply to the Advice Given by the Petitioner's Trial Counsel, Did the Instructions of Steven Bell Regarding the Issue of Possible Deportation Conform to the Teachings of *Padilla v. Kentucky*? . . . . 41

VIIII. Did the Advice of Attorney Robert Brown to the Petitioner Concerning the Subject of Deportation Comply with the Teachings of Padilla v. Kentucky? . . . . . . . . . . . . . . 44

IX.    If the Court Finds that Steven Bell, Pursuant to the Teachings of *Padilla v. Kentucky*, Discharged His Obligation to Provide Competent Advice To His Client By Recommendation that She Consultt with Attorney Robert Brown With Respect to Deportation Issues, and Assuming that the Advice of Attorney Robert Brown,Failed to Comply with the Teachings of *Padilla v. Kentucky*, is the Petitioner Entitled to a Writ of *Corum Nobis* Because the Ineffective Assistance of her Civil Lawyer, Robert Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

X.     If it is Determined, After Consideration of the Totality of the Circumstances that the Petitioner's Right to the Effective Assistance of Counsel in the Context of *Strickland v. Washington* and the Teachings of *Padilla v. Kentucky* was Violated, Has the Petitioner Established the Second Prong of *Strickland v. Washington*, i.e., Prejudice? . . . . . . . . .45

XI.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

(1:07 CR 228 and
 1:08 CV 31)

I.  Introduction

Presently pending before the Court is the petitioner-defendant, Ramini Sri Pilla's

(hereafter "petitioner") verified petition for a writ of *corum nobis* filed on September 4, 2009

following her conviction and sentence for a violation of 18 U.S.C. § 1001.  Doc. 49.

Initially, a review of the history of the criminal case is appropriate.

A.  The Information

On April 16, 2007, in criminal case number 1:07 CR 228, an Information charging a

violation of 18 U.S.C. § 1001 was filed against the petitioner.[1]  The Information stated in its

---

[1]18 U.S.C. Section 1001 states in relevant part as follows:

> (a) Except as otherwise provided in this section, whoever, in any
> matter within the jurisdiction of the executive, legislative, or
> judicial branch of the Government of the Unite States, knowingly
> and willfully --
>
> > (1) falsifies, conceals, or covers up by any trick,
> > scheme, or device a material fact;
> >
> > (2) makes any materially false, fictitious, or
> > fraudulent statement or representation; or
> >
> > (3) makes or uses any false writing or document
> > knowing the same to contain any materially false,
> > fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years or,
> if the offense involves international or domestic terrorism (as
> defined in section 2331), imprisoned not more than 8 years, or
> both.  If the matter relates to an offense under chapter 109A, 109B,
> 110, or 117, or section 1591, then the term of imprisonment
> imposed under this section shall be not more than 8 years.

1

(1:07 CR 228 and
 1:08 CV 31)

entirety as follows:

<u>COUNT 1</u>

(FRAUDULENT AND FALSE STATEMENTS IN VIOLATION
OF TITLE 18, UNITED STATES CODE, SECTIONS 1001 AND 2)

<u>General Allegations</u>

1.      At all times material herein, RAMINI SRI PILLA, defendant herein, was

employed by Case Western Reserve University ("CWRU") in Cleveland, Ohio as an Assistant

Professor in the Department of Statistics.

2.      At all times material herein, the Federal Bureau of Investigation ("FBI"), an

agency of the Executive Branch of the Government of the United States, had the authority to

investigate hate crimes committed in violation of Title 18, United States Code, Section 245.

3.      From on or about December 19, 2006 to on or about February 28, 2007, in the

Northern District of Ohio and elsewhere, Defendant perpetrated a hoax on CWRU and the FBI

by knowingly and willfully making the following material false statements to agents of the

Federal Bureau of Investigation ("FBI") alleging that, because of her ethnic origin and her

gender, she had been the victim of a series of hate crimes.

(1) On or about January 23, 2007, Defendant reported to the FBI that on August

28, 2006, November 16, 2006, and January 16, 2007, she had received threatening

hate mail in her office at CWRU.  When asked by an FBI agent who might have

sent her the letters, she named three possible suspects, all of whom were CWRU

employees.  She further stated that the suspects were motivated in part by her race

2

(1:07 CR 228 and
 1:08 CV 31)

and gender.

(2) On or about February 24, 2007, Defendant reported to the FBI that earlier in

the day she had discovered a fourth threatening hate letter on the floor of her

office at CWRU.

(3) On or about February 28, 2007, Defendant, when being interviewed by an FBI

agent about the above letters, stated that she believed the senders of the hate mail

described above were retaliating against her for (1) making a complaint to a

CWRU hotline alleging discrimination and (2) filing a complaint with the Equal

Employment Opportunity Commission against CWRU alleging discrimination.

4.      At the time Defendant made the statements described above, she knew they were

false in that she had prepared the threatening hate mail herself and had delivered the letters to

herself.

5.      The false statements described above had the following affects:

(1) The FBI expended resources to investigate the crimes reported by Defendant

at a cost of approximately $5,830.00.

(2) CWRU expended police department, management and in house legal

resources responding to Defendant's complaints at a cost of approximately $74,975.00.

(3) CWRU retained outside counsel, at a cost of approximately $4,445.00 to

defend CWRU against a complaint Defendant filed in Cuyahoga County Common Pleas Court

on or about January 25, 2007 seeking a temporary restraining order and injunctive relief and

alleging that CWRU had not "taken every reasonable action necessary to protect her life, health,

3

(1:07 CR 228 and
 1:08 CV 31)

and safety" in response to the threatening letters she claimed to have received. and

           (4) The Cuyahoga County Common Pleas Court expended resources in

connection with the lawsuit described in paragraph (3) above at a cost of approximately $235.06.

      All in violation of Title 18 United States Code, Sections 1001 and 2.

      <u>B.  The Delayed Plea of Guilty to the Information</u>

      It has been the Court's experience where the defendant has agreed to be prosecuted by

way of an Information that the defendant normally enters a plea of guilty on the day of the

arraignment.  However, such a practice was not followed in this case.  The defendant was

arraigned on May 1, 2007 and entered a plea of not guilty.  The Court scheduled the trial for

June 25, 2007.  Subsequently, the defendant moved to continue the trial.  Doc. 7.  The Court

granted the motion and rescheduled the trial for September 4, 2007.  During this period of time,

the Court was advised that the defendant would stand a better chance of avoiding deportation if

her anticipated plea of guilty was entered after she had a green card for a period of five years.

Hence, the delay.  Eventually, the defendant entered a plea of guilty to the  Information on

August 13, 2007.

      <u>C.  The Petitioner's Plea of Guilty to the Information Without Admitting to the Allegations in<br>Paragraph 3(1) in the Information and the Court's Commentary</u>

      The petitioner entered a plea of guilty on August 13, 2007 after the following initial

colloquy as follows:

           THE COURT:      The Court calls the case United States of
America versus Ramini Sri Pilla, Case Number 1:07CR228.

           This case began with the filing of an information.  The defendant

4

(1:07 CR 228 and
 1:08 CV 31)

waived her right to require this case be presented to the Grand
Jury.  And since that time there has been some hesitation, I guess
would be the best way I could describe the defendant's decision, as
to whether she wished to enter a plea of guilty to this information
or go to trial.

And because of what the Court viewed as indecision on her part,
the Court did schedule the case for trial, I believe, in September, if
I recall.  And I have now been informed that it's the present
intention of the defendant to plead guilty to the information with
respect to subsections 2 and 3 of paragraph 3 in the information,
but not to subparagraph 1, if I understood what Mr. Bell told me at
side-bar.

Is that an accurate description?

MS. ROWLAND:      That's my understanding, you Honor.

The Court then engaged counsel for the government in further discussion concerning the

nature of the anticipated guilty plea in the following discussion:

THE COURT:          Well, I guess the difficulty I have with that
is that paragraph 2 -- subparagraph 2 under 3 appears to relate to
subparagraph 1, because subparagraph 1 talks about receiving hate
mail at her office.  And it goes on to say: When asked by the FBI
agent who might have sent her the letters, she named three possible
suspects, all of whom were CWRU employees.

If you eliminate that paragraph, then I don't understand what
paragraph 2 means because it says: On or about February 24, 2007
defendant reported to the FBI earlier in the day that she had
discovered a fourth threatening hate letter on the floor of her office
at CWRU.

That doesn't make any sense if you don't have paragraph 1 in
there.  So I'm puzzled, frankly.

MS. ROWLAND:      Well, you Honor, the conversations with
defense counsel have indicated that Dr. Pilla is willing to admit
that she made the false statements on two separate occasions

5

(1:07 CR 228 and
 1:08 CV 31)

regarding the fourth letter that she reported to the FBI, but she is not willing to admit that she made the false statement on January 23 about the first three letters.

And in my view, since she will be prepared to make a factual basis that comports with a violation of Title 18 Section 1001 regarding the statements she made to the FBI on February 24 and February 28, that it will be sufficient for the Court to find the defendant guilty of this count once she gives her factual basis -- or once I give the factual basis.

THE COURT:        And then if the Court accepts that plea, then I gather, based on the latest decision of the Sixth Circuit, it would be improper for me to consider subparagraph 1.

MS. ROWLAND:        Well, in the government's view, at sentencing we would be prepared to present evidence about all of the relevant conduct for the Court's consideration because that would go into the history and characteristics of the defendant and the seriousness of the offense, which in the government's view --

THE COURT:        Well, I just got reversed, as you probably know, in a published opinion where I sentenced the defendant within the guidelines but indicated I was going to consider a letter that was sent to me in confidence, a summary of which I gave to defense counsel.  And the Sixth Circuit, in its infinite wisdom, decided I was wrong and sent the case back for resentencing.  I'm now supposed to eliminate from my mind what I read in that disclosure that I summarized but did not make available to counsel for the defendant or the defendant.

Now, your position is I don't have to eliminate from my memory what's in paragraph 1 even though the defendant's not going to plead guilty to it?

MS. ROWLAND: I think they will contest it at the sentencing as part of her history and characteristics.

THE COURT:        Why should I accept a plea to the information?

6

(1:07 CR 228 and
 1:08 CV 31)

> MS. ROWLAND:     Because she is going to make a factual basis
> that would constitute an offense.  And I think the law is --
>
> THE COURT:     But you are not willing to strike paragraph 1
> from the information?
>
> MS. ROWLAND:     Well, I could, but it would have no legal
> impact because I think at sentencing I would still be entitled to
> present evidence about the total course of conduct and all the
> relevant conduct.
>
> That's distinguished from the situation in your case because in this
> case the defense has had full access to all the information on which
> the government will rely.
>
> THE COURT:     Yeah, I think you're right.  Yeah, that's the
> difference.  Okay.  I'll proceed.

### D.  A Review of the Transcript of the Guilty Plea

**1.     The factual basis stated by AUSA Rowland in support of the defendant's guilty plea.**

The government did not present a signed plea agreement in advance of the defendant's

plea of guilty because the parties were unable to agree on the amount of restitution.  Thus, there

was no written plea agreement.  The Court requested a factual basis which was then submitted by

AUSA Rowland and as follows:[2]

> THE COURT:     Now, finally, I'm required to find that there
> is a factual basis for your plea of guilty.  And I would like the
> government to elaborate on the factual basis, if they might, please.
>
> MS. ROWLAND: Your Honor, by way of background, I would
> state that during the period of time that's charged in the
> information, Dr. Pilla was in a series of ongoing disputes with
> Case Western Reserve University regarding her employment.

---

[2]Doc. 20, p. 32, line 2 through pg. 39, line 16.

7

(1:07 CR 228 and
 1:08 CV 31)

She had a number of complaints about the circumstances of her work and had filed a complaint with the EEOC and also on the university's hotline.

As I stated, at sentencing the government would be prepared to prove, and if we had gone to trial the government would have proven, that beginning on August 28, Dr. Pilla started reporting to the Case Western Reserve police receiving hate mail in her office at Case Western Reserve.

We would be prepared to prove that she was motivated to place this first note herself and report it by a desire to have her position moved from the Department of Statistics to the Department of Biology which she believed to be a more conducive work environment for her.

She then placed a second note on November 16, or at least she reported it to the Case Western Reserve police on that date.

I won't describe the notes in detail, but this one indicated: You don't belong in the department.  Be gone or else face dire consequence.

She reported to the Case Western Reserve police that this made her feel afraid and that she did not want to disappear.

Shortly after this second note on November 16, unbeknownst to Dr. Pilla, the Case Western Reserve police installed a camera in the hallway outside of her office.

Also, in the early fall of 2006, Dr. Pilla began confiding in a close friend of hers in New Mexico about the notes that she had been receiving and complained to him that the police were not taking them seriously.

The friend of hers happened to have a professional relationship with an FBI analyst in New Mexico and took it upon himself to contact that person and report her situation.

There followed a series of e-mails between this FBI analyst in New Mexico, Dr. Pilla's friend there, and Dr. Pilla herself.

8

(1:07 CR 228 and
 1:08 CV 31)

And on January 5 -- and also it generated a referral to the
Cleveland office of the FBI.

On January 5, of 2007, Dr. Pilla sent an e-mail to the analyst in
New Mexico saying that she had not yet received a call from
anybody in the Cleveland FBI.  I'm not sure if they're pursuing it,
she states.

Then on January 11, 2007, the analyst in New Mexico sent an e-
mail to Dr. Pilla stating that she had just gotten off the phone with
an agent from the Cleveland office.  They would be happy to look
into the problems you have been experiencing.  And she said she
was going to follow up with another e-mail to Cleveland.

Then five days later after that e-mail, she reported to the FBI and
to the Case Western Reserve police -- excuse me.  She replied to --
she reported to the Case Western Reserve police not yet the FBI,
that she had received a third threatening note in her office.

This note accused her of being a plagiarist, which in fact had been
an issue, an ongoing issue at Case Western Reserve.  She had been
accused of plagiarism.  And it went on with some rather vitriolic
language.

On January 23, Dr. Pilla had her first meeting with the FBI,
Special Agent Ryan Pierrot, and at trial we would have proved that
she reported that she had received the three prior notes that I
discussed on August 28, November 16 and January 16.

When asked who would have sent her the letters, she named three
possible suspects, all of whom were her colleagues at Case
Western Reserve.  And she believed that these people were
motivated in part by her race and by her gender.

On January 25, she caused a complaint for a temporary restraining
order and injunctive relief to be filed in Cuyahoga County
Common Pleas Court alleging that the university had not taken
every reasonable action necessary to protect her life, health and
safety.

On January 28, Dr. Pilla sent an e-mail to the FBI analyst in New

9

(1:07 CR 228 and
 1:08 CV 31)

Mexico stating that the Cleveland FBI office had contacted her and thanking her for arranging for the interview.  She greatly appreciates it and hopes that the matter will be investigated.

On February 8, she had a meeting with Special Agent Pierrot at her own office indicating that she had researched handwriting analysis.  She stated to the FBI that she had researched handwriting analysis on the Internet and learned that it was hard to decipher handwriting when it was prepared slowly and when a person writes a word by lifting his or her hand up after writing each letter of the word.  And she demonstrated this with a piece of paper on her desk.

It should be noted that the first two notes were written in that manner.

On February 24, around midday, Dr. Pilla left a voice mail message for Special Agent Pierrot stating that she had received another note in her office.  She sounded very distraught on the telephone.

Later that day Special Agent Pierrot had a telephone conversation with Dr. Pilla about the fourth note.  They made arrangements to talk in person on February 28, four days later, Dr. Pilla coming down to the offices of the FBI.

The interview started out with her providing agents with copies of various documents concerning her disputes with the university including her hotline complaint.

She related several of her complaints about the university, including that she had filed complaints with the National Science Foundation Office of Inspector General and had attended an EEOC mediation in July of 2006, just a month before the first note.

She told the agents that her filing of these complaints had made someone angry, quote/unquote.

The agent asked Dr. Pilla when she had last been at Yost 338, her office, where the fourth note had been delivered under the door, and she said that it had been on February 2, several weeks before.  And she said she returned to that office for the first time on

10

(1:07 CR 228 and
 1:08 CV 31)

February 24 and had found the fourth note.

She repeated that she believed her complaints against the
university related to the notes.  Thereafter, Dr. Pilla was
confronted with the fact that the camera in the hall had caught her
placing the fourth note under the door on February 21, even though
she had said she hadn't been there since February 2.

She admitted that she had slid each one of the notes under her
office door and that she did it because she was under so much
stress and she wanted to be out of the statistics department.

She had been informed in August 2006, prior to the first note, that
she had no future at Case.

She was also informed in August that she was being accused of
plagiarism.  This is all by her own report to the FBI on that date,
August -- or February 24.

She wrote the first note, she said, because she had thought Case
would get her out of the statistics department and into the biology
department.  She could not recall if she wrote the first note at home
or in the office.

She said she possibly fabricated the second note at home and it
was prompted by several incidents. This was the note in
November, November 16.

The incidents that prompted her to place the second note were that
she did not have access to her grants and was not getting paid, that
whenever she asked someone to do something for her it did not get
done, that she had spent a lot of time prepping to teach a course in
the spring term to find out she could not teach the course while at
the same time another professor had an easier time getting his
course approved.  She worried that these events would affect her
NSF award, and that all of these events culminated in her writing
the second note.

She said she wrote the third note in January of 2007 on her home
computer after one of her colleagues told a mathematician that she
had plagiarized four pages of a paper.

11

(1:07 CR 228 and
1:08 CV 31)

She said she created the fourth note in February, just a few days
before, because she had tried to recruit a post-doc student using her
NSF career award.  Because she was on a terminal contact, Dr.
Pilla could not recruit Ph.D. students and attempted to use her
funds to recruit a post-doc.

She stated she wrote the series of letters to portray the reality of
her situation so people in the outside world could see the hostile
work environment in which she was trying to work.

The agents asked her to sign a written statement on the 24th, but
she declined to do that.  But she did say she was sorry for what she
did.

Later that day Dr. Pilla attended a dinner for a  fellow faculty
member, and after that dinner she confided to him that she had
confessed to the FBI that she had written all the notes.  And later
that night she also called her friend in New Mexico and admitted
to him that she had admitted to Special Agent Pierrot that she had
placed all four notes.

She also left a voice mail message for Special Agent Pierrot stating
that after a good night's sleep she would sign the statement and
answer any further questions.

Your Honor, the government would also prove at sentencing that
the FBI, Case Western Reserve, and the Cuyahoga County
Common Pleas Court all expended resources in response to her
complaint in the amounts that you went over when you went over
the information.

THE COURT:          The Court finds that there is a factual basis
to support a plea of guilty to the information with the
understanding that the allegations in subparagraph 1 under
paragraph 3 will be stricken.

**2.       The Court's relevant questions to the petitioner regarding her anticipated guilty
plea**.

As is the Court's custom, it inquired of the defendant, prior to her offering a plea of

12

(1:07 CR 228 and
 1:08 CV 31)

guilty, as follows:[3]

> THE COURT:         Now, the main thing I want you to carry
> away with here is that if you do decide to plead guilty to this
> information, there is no guarantee as to what my sentence will be.
>
> Do you understand that?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:         Has anybody promised you what my
> sentence will be if you plead guilty?
>
> THE DEFENDANT:  No, your Honor.
>
> THE COURT:         Mr. Bell is allowed to speculate or predict
> what he thinks I might do.  He might decide to do that; he might
> decide not to do that.  I've known Mr. Bell for many years and he
> is an excellent lawyer.  And for all I know, he has what I call the
> book on me as far as a judge is concerned and feels he is
> comfortable in predicting what I might do.  But as long as you
> understand it's a prediction and not a guarantee, he can predict all
> he wants to.
>
> Do you understand?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:         Okay.
>
> Now, again, I want to go back.  If you do plead guilty here today,
> will your plea of guilty be voluntary on your part?
>
> THE DEFENDANT:  Yes, your Honor.
>
> THE COURT:         Will it be an exercise of your own free will?
>
> THE DEFENDANT:  Yes, your Honor.

_____

[3]Doc. 20, p. 30, line through p. 31, line 10.

(1:07 CR 228 and
 1:08 CV 31)

>          THE COURT:          Has anybody forced or threatened you to
>          plead guilty?
>
>          THE DEFENDANT:  No, your, Honor.

**3.      The sentencing computation as discussed during the change of plea hearing.**

Consistent with the Court's custom, the transcript of the change of plea hearing reveals

the following discussion regarding the sentencing consequences.[4]

>          THE COURT:          All right.  Now I want to talk now about the
>          sentencing consequences of your plea of guilty.  And bear in mind
>          I still haven't asked you for your plea.  We haven't reached that
>          point yet.  But as I understand from reading this, the maximum
>          sentence that could be imposed in this case is five years
>          imprisonment.
>
>          Am I correct on that?
>
>          MS. ROWLAND:       Yes, your Honor.
>
>          THE COURT:          And supervised release would be for what
>          period, do you know?  Two years?  Three years?
>
>          MS. ROWLAND:       Two years, your Honor, minimum;
>          maximum of three years.  And a $250,000 fine.
>
>          THE COURT:          All right.  Now, that's the maximum
>          sentence that the Court can impose.  When I say maximum, that's
>          the most the Court can impose.
>
>          Do you understand?
>
>          THE DEFENDANT:  Yes, your Honor.
>
>          THE COURT:          Now, would you please give the defendant a
>          copy of the sentencing table.

---

[4]Doc. 20, p. 22, line 11 through p. 30, line 11.

14

(1:07 CR 228 and
 1:08 CV 31)

And do you have a copy for me because I don't have one up here.

Now, it's going to take me awhile to talk about the sentencing consequence if you in fact plead guilty or are found guilty, and it's pretty complicated.  And even though you have a Ph.D., it may be that you will have trouble following my explanation.  And I will not feel troubled if you say, Judge, I don't understand.

Fair enough?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          Okay.  Now, in 1987, I guess, or '88, I forget now, the Congress of the United States decided we should have sentencing guidelines in every criminal case where there was a conviction.  And as a consequence of that, the Court has to make two determinations with respect to any defendant who pleads guilty or is found guilty.

And those determinations are, first, what's the offense level?  And if you look at the table, you'll see it's got the phrase Offense Level at the top, and it goes all the way down from 1 all the way down to 43.

Do you see that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          Do you see across the top it has Criminal History Category?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          And it has Criminal History Points, and that relates to the defendant's record of convictions, if any.  For instance, even if you have no conviction you are a Criminal History Category I, which always seemed to me to be a pretty stupid statement, but that's the way they worked it out.

So in any event I have to make those two determinations: What's the offense level and what's the criminal history category.

15

(1:07 CR 228 and
 1:08 CV 31)

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:        Okay.  Now, do a hypo for me.  Assume that
I have to sentence somebody today -- Mr. Bell, don't even help
her.  I want her to do this on her own -- that has an offense level of
20.  Have you got that, 20?

THE DEFENDANT:  Yes.

THE COURT:        And a Criminal History Category of Roman
numeral III.  Where does that person fit on the table?

THE DEFENDANT:  Zone C, and 41 to 51.

THE COURT:        That's right.  You passed.  Do you know
what the numbers stand for?

THE DEFENDANT:  I would assume that's the points that would
be allocated to the --

THE COURT:        No, no.  What do the -- 41 to 51, what do
those numbers stand for?

THE DEFENDANT:  That's what I'm assuming those are
probably attached -- that would determine the sentencing.

THE COURT:        Well, no.  Look up here.  See where it says
Sentencing Table?

THE DEFENDANT:  Oh sorry.

THE COURT:        In terms of months?

THE DEFENDANT:  Yes, yes.  Okay.

THE COURT:        It's not years.  It's months.  So what that
would tell me is in that particular make-believe situation, I could
sentence that defendant to as many as 51 months or as few as 41
months.

16

(1:07 CR 228 and
 1:08 CV 31)

THE DEFENDANT:  Yes.

THE COURT:        Or anywhere in between.

THE DEFENDANT:  Yes.

THE COURT:        But, before I would do that, I would have to decide whether or not the government was entitled to an upward departure or the defendant was entitled to a downward departure.

Departure means that the Court's going to pick a period of time outside the guideline range.  And if the government picks a number above 51, and say the Court decides 60 months, that would be called an upward departure.  And in that event, the defendant, even if he or she agreed that I calculated the guidelines correctly, could challenge that upward departure on appeal.

Well, the same applies the other way.  If I say to this 41 - to 51-month defendant, well, 41 months is just too much time, I'm going to make it 24 months, that would be a downward departure.  And in that event, the government has the right to appeal and challenge the downward departure.

You think it's complicated enough, but it even gets worse.  But before we do that, I want to ask counsel if they have any suggestion or guidance as to what they think the offense level would be here for the defendant if she enters a plea of guilty to this information.

MS. ROWLAND:      Your Honor, based on the cost of this offense to the victims in this case, we would be recommending a sentence in the range of 12 to 18 months at a level 13.

THE COURT:        Okay.  So your belief is -- and that would be after giving the defendant credit for acceptance of responsibility?

MS. ROWLAND:      No.  That would be before acceptance of responsibility.

THE COURT:        All right.  The reason I asked the question about acceptance of responsibility is that the Court has to consider

17

(1:07 CR 228 and
 1:08 CV 31)

whether the defendant should be given credit for acceptance of responsibility by the plea of guilty.

And if the court decides that and grants a two-level reduction for acceptance of responsibility, if I understand what Ms. Rowland said, it would be 8 to 14 months assuming you're a Criminal History Category I.

MS. ROWLAND:      I'm sorry, you Honor.  I'm sorry to correct my statement.  I did misstate.  The level 13 would be after acceptance of responsibility.

THE COURT:          All right.  All right.  So acceptance of responsibility would wind up at a 12- to 18-month sentence assuming she's a Criminal History Category I.

MS. ROWLAND:      Correct.

THE COURT:          And is there any indication that either counsel knows about that the defendant has a criminal record that would put her above Criminal History Category I?

MS. ROWLAND:      We are not aware of any criminal history, your Honor.

MR. BELL:    Nor am I, your Honor.

THE COURT:          All right.  Do you understand that if you do plead guilty, I'll order a presentence report.  And even though counsel have predicted for me what they believe the Criminal History Category will be, if the presentence report comes back with a different number, I have to follow that if I think it's been established.

Do you understand?

THE DEFENDANT:  Yes.  Attorney Bell told me.

THE COURT:          For instance, just to give you an example, let's say they come back and say, oops, the defendant has three criminal history points.  She is now in the category of 15 to 21

18

(1:07 CR 228 and
 1:08 CV 31)

months as opposed to 12 to 18 month?

Do you see and understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          Now, I'm not making any kind of a final
decision today on what the offense level is.  I have to wait until I
get the presentence report and hear any objections that counsel has
as to what that final offense level should be.

Do you understand?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          There is no agreement that requires the
Court to find that.  But I'm still not through with the complexity of
the situation.

About two years ago now, the Supreme Court in what some might
call a mind-boggling decision, decided that the mandatory
guidelines are unconstitutional.

But then another group of five justices decided that they were
advisory, not mandatory as they had been before.  They went on to
say the Judge has to determine what that advisory guideline range
is, and then the Court should consider the sentencing factors under
18 United States Code Section 3553(a).  And I have to confess, I
wasn't even aware of those sentencing factors until that decision
came down.

Now, in every case I'm required to consider those sentencing
factors, and I have the power now to vary above the guideline
range or vary below the guideline range after I've considered those
factors.

Do you understand?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          Now, there is no agreement here, there is no

19

(1:07 CR 228 and
 1:08 CV 31)

agreement whatsoever, so the government has the right to argue to me that I should vary above the advisory guidelines, the high number, which, with the calculations here that the government and your counsel have suggested, I would have the power to vary above 18 months.

But if I were to do that, I would have to give you advanced notice that I was considering varying above 18 months.

Do you understand so far?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          By the same token, Mr. Bell has the opportunity to suggest to me that I should vary below the 12 months and make an argument consistent with that proposal.

And if he does that, then I have an obligation to consider that also.

Do you understand?

THE DEFENDANT:  Yes, your Honor.

THE COURT:          Now, the main thing I want you to carry away with here is that if you do decide to plead guilty to this information, there is no guarantee as to what my sentence will be.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

**4.      The deportation issue**

During the sentencing hearing, the following colloquy took place regarding the

possibility of deportation:[5]

MS. ROWLAND:      Your Honor, one matter, although not

---

[5]Doc. 20, p. 39, line 20 through p. 40.

20

(1:07 CR 228 and
 1:08 CV 31)

> legally required, that you might want to go into is whether she understands the consequences of her plea as it might affect her immigration status.
>
> THE COURT:          Well, it was my recollection earlier in the case that there was the hope that if the defendant were to enter a plea of guilty, it would be after she had been in the United States for a period of five years with a green card, and we've now moved past that, have we not?
>
> MR. BELL:    We are, your Honor.
>
> THE COURT:          I don't, frankly, purport to be an expert on immigration or for that matter deportation.  I've sat enough at circuit courts to know that they're overwhelmed with deportation issues, but I in no way would hold myself out as an expert on it other than to say to the defendant that if you plead guilty to the information, you may be subject to deportation.  And beyond that, I am unable to give you any specific information.
>
> Do you understand?
>
> THE DEFENDANT:  Yes, your Honor.
>
> MR. BELL:    Your Honor, just for the record, the defendant has secured immigration counsel to be representing her, and she's had the opportunity to consult with him prior to today's proceedings. (Emphasis added).
>
> THE COURT:          Very well.

E.  The Petitioner's Acceptance of Responsibility

The petitioner's acceptance of responsibility is set forth in paragraph 53 of the

presentence report and indicates as follows:

> On September 13, 2007, the defendant provided the following written statement in regard to her offense:
>
> "I accept full responsibility for my actions.  I have entered a plea

21

(1:07 CR 228 and
 1:08 CV 31)

of guilty to making false statements to the FBI concerning the placement of a threatening note in my office at Case Western Reserve University.  This threatening note was placed in my office on February 24, 2007.  I was interviewed by the FBI about this note on February 28, 2007.  My guilty plea concerns this February 24 note and my statements made to the FBI on February 28.

"I was the under the care of a mental health professionals [sic] during the fall of 2006.  I remain under such care today.  I have been diagnosed with Major Depressive Disorder, recurrent, Severe with Psychotic Features (DMS 296.34) and Anxiety Disorder (DSM 300.)).

"Early in 2007, I was prescribed a medication (Klonopin) by my psychiatrist.  I had this prescription filled on January 24, 2007, and continued taking this medication until March 1, 2007.  This medication caused me to suffer lapses in memory and judgement [sic].  I was under the influence of this medication at the time I was interviewed by the FBI on February 28, 2007.

"Soon after my meeting with the FBI on February 28, 2007, I was admitted to the psychiatric unit of Lutheran Hospital.  I had suffered a nearly complete mental breakdown.  Since being discharged from Lutheran Hospital, I have stopped taking the prescription medication described above, and I am feeling much better.

"I appreciate deeply all the efforts made by the FBI to help me, and I am extremely apologetic to Special Agent Ryan Pierrot for my actions.  This crime has cost me my reputation, my job, my savings and my career.  I face uncertainty as to whether I will be allowed to remain living in the Untied States.  I have hurt deeply many persons at Case Western Reserve University who had tried to advance my career as a scientist.  I apologize to Dean Cyrus Taylor, Professor Joseph Koonce and to all others at CWRU whom I have hurt.

"I have never before been in any type of legal trouble.  I can promise all who may read this that I am deeply sorry for my actions, and that I will never again be involved in a criminal case."

22

(1:07 CR 228 and
 1:08 CV 31)

F.  The Court's Sentence

The Court conducted a lengthy sentencing hearing during which the Court considered the specific offense characteristic as to the amount of the loss created by the conduct of the defendant.  The presentence report had calculated the loss in excess of $70,000 which would have resulted in a determination that the final offense level, after deducting two levels for acceptance of responsibility, would have been 12.  However, after conducting the lengthy sentencing hearing, the Court calculated the loss to be the sum of $66,240.39, which resulted in the final offense level being calculated as 10 rather than 12, providing for a sentencing range in Zone B of six to 12 months under the Advisory Sentencing Guidelines.  As indicated in the Court's Memorandum Opinion analyzing the sentencing factors, Dean Taylor of the College of Arts and Sciences for CWRU advocated a prison sentence.  Counsel for the government argued for a prison sentence at the half-way range of six to 12 months, and counsel for the defendant requested a sentence of probation, accompanied by house arrest for six months.  The Court imposed a sentence of six months confinement with supervised release for a period of two years as well as an order of restitution with $60,175 being paid to CWRU, $5,830.31 being paid to the FBI and $235.08 to the Common Pleas Court of Cuyahoga County.

G.  The Petitioner's Habeas Corpus Action

On January 4, 2008, the petitioner filed a motion to vacate her sentence under the provisions of 28 U.S.C. § 2255 and also moved for a stay of her sentence.  Docs. 33 and 34.

The Court ordered the petitioner's sentence stayed.  Doc. 35.  Also on January 4, 2008, Steven D. Bell, the petitioner's retained counsel, moved to withdraw as counsel and the Court

(1:07 CR 228 and
 1:08 CV 31)

approved Mr. Bell's withdrawal.  Doc. 37.  On January 10, 2008, counsel for the government

filed a motion to dismiss the petitioner's application under the provisions of 28 U.S.C. § 2255.

Doc. 38.

Eventually, on February 27, 2008, the Court denied the petitioner's application under §

2255 and also declined to issue a certificate of appealability.  The petitioner was ordered to self-

surrender on Monday, March 10, 2008.  (Doc. 42, 43).  On February 29, 2008, the petitioner

moved for a bond pending appeal (Doc. 45), the Court denied the motion for bond pending

appeal, and modified the petitioner's self-surrender date from March 10, 2008 to March 17,

2008.  Doc. 47.

<u>II.  The Petition for *Corum Nobis*</u>

On September 4, 2009, the verified petition for *corum nobis* was filed.  Doc. 49.

Thereafter, the government filed a motion to dismiss the petition for *corum nobis*.  Doc. 51.

Discovery ensued.  Depositions were taken of the petitioner, Attorney Steven Bell and Attorney

Robert Brown.  The deposition of the petitioner has been filed (Doc. 65); the deposition of

Attorney Bell has been filed (Doc. 67) and the deposition of Attorney Robert Brown (Doc. 68)

has been filed.

On April 9, 2010, a supplemental memorandum in support of the petition for a writ of

*corum nobis* was filed.  Doc. 72.  On July 22, 2010, counsel for the government filed an

additional response in opposition to the petition.  Doc. 76.

The verified petition for a writ of *corum nobis* pursuant to 28 U.S.C. § 1651(a) was filed

on September 4, 2009 and listed two grounds in support of the petition:

24

(1:07 CR 228 and
 1:08 CV 31)

>A.    PETITIONER WAS DENIED HER CONSTITUTIONAL
>RIGHT TO EFFECTIVE ASSISTANCE OF TRIAL COUNSEL,
>RENDERING HER GUILTY PLEA UNKNOWING AND
>INVOLUNTARY.
>
>(1) Counsel failed to correctly advise Petitioner, prior to her guilty
>plea, of the collateral effects of her guilty plea on her immigration
>status.
>
>(2) Counsel failed to object to the inclusion of damages allegedly
>suffered by Case Western Reserve University as part of the Court's
>sentencing in terms of restitution, without requesting that the Court
>distinguish between the loss that was specifically tied to the count
>to which the Petitioner plead, versus amounts of loss, such as that
>allegedly suffered by Case Western Reserve University, which are
>either based upon counts to which the Petitioner did not plead or
>upon general conduct.

The petitioner, through counsel, filed a supplemental memorandum in support of the

petition for *corum nobis* on April 9, 2009.  Doc. 72.  In support of the petition, counsel advanced

additional propositions including:

1.    Petitioner is not required to prove actual innocence.

2.    Petitioner is innocent of the charge for which she was convicted and of all other

charges she was facing.

3.    Petitioner is eligible to seek relief through a writ of *corum nobis* and her claims

are not moot as a result of her removal.

4.    Petitioner is entitled to relief sought in her petition by reason the ineffective

assistance of counsel.

5.    The petition for relief is supported by the recent decision of the Supreme Court in

*Padilla v. Kentucky*.

25

(1:07 CR 228 and
 1:08 CV 31)

### III.  Summary of the Government's Opposition to the *Corum Nobis* Petition

The government has filed a thorough opposition to the petition numbering 51 pages and following the three depositions of the defendant, the defendant's criminal trial counsel, Steven Bell, and the defendant's immigration counsel, Robert Brown.

The government offers three basic oppositions to the petition as follows:

1.     Prior to her guilty plea, the defendant was advised of the risk of deportation by her criminal defense attorney, her immigration attorney and by the court.

2.     The defendant has not established prejudice from the alleged mis-advice her immigration attorney provided prior to her guilty plea.

3.     The writ is not available to a petitioner such as Ramini Pilla who is on supervised release.[6]

### IV.  The Court's Fact Findings

Before engaging in an analysis of *corum nobis* jurisprudence, the Court is of the view that specific fact findings by the Court are necessary as a basis for applying established *corum nobis* precedent.  The Court finds the following facts to have been established:

1.     The petitioner confessed to the FBI on February 28, 2007 her role in the attempted hoax after she was told she was seen placing two notes under the door to her office which notes supported the claim of a harassment.[7]

---

[6]The petitioner has returned to her native country of India and is obviously not on any supervised release supervision.

[7]*See* attached hereto Appendix I identified as Exhibit A in the government's brief and constituting the FBI 302 dated 2/28/07.

26

(1:07 CR 228 and
 1:08 CV 31)

2.      Shortly after confessing to the FBI, the petitioner contacted Attorney Steven Bell

within 48 hours to represent her in anticipated criminal charges.[8]

3.      Steven Bell recalls calling Attorney Robert Brown's office on the next day after

he first met with the petitioner and requesting assistance in helping the petitioner through the

immigration questions which were matters that Attorney Bell did not feel competent to handle.[9]

4.      Mr. Robert Brown, the lawyer who the petitioner consulted regarding the

deportation issues, specializes in immigration and was employed previously as an acting regional

director for the U.S. Immigration Naturalization Service.

5.      Steven Bell recalls on April 13, 2007 a lengthy telephone conversation with

Attorney Brown, and later that day, sent Brown a copy of the Bill of Information that was going

to be filed and indicated that the subject of conversations with Attorney Brown were the

immigration consequences if the petitioner were to enter a plea of guilty to the Bill of

Information.

6.      The petitioner went to the office of Attorney Robert Brown on June 18, 2007 and,

according to Mr. Brown, at the insistence of Attorney Steven Bell, that she retain an immigration

attorney because she may be facing removal charges.  *See* Brown Depo. Doc. 68, at page 16.

7.      After the Information was filed on April 16, 2007, a delay ensued with respect to

disposition of the Information so as to provide the petitioner with the fact that she had had her

green card issued five years before her guilty plea.

_____

[8]*See* Steven Bell deposition, Doc. 67 at p. 9.

[9]*See* Steven Bell deposition, Doc. 67 at p. 10.

27

(1:07 CR 228 and
 1:08 CV 31)

8.      Attorney Robert Brown indicated that he advised Steven Bell to at all costs avoid

an aggravated felony guilty plea.  *See* Doc. 68 at page 35.

9.      The petitioner's guilty plea was taken by the Court on August 13, 2007.

10.     During the taking of the guilty plea, the petitioner indicated she had not been

promised what the sentence would be, that her guilty plea was an exercise of her own free will

and that no one had threatened or forced her to plead guilty.

11.     During the taking of the guilty plea, the deportation issue was raised by the

government leading to inquiry by the Court and during which Steven Bell, the petitioner's

counsel, advised the Court that the petitioner had secured immigration counsel and that she had

the opportunity to consult with him prior to the proceedings.  The petitioner offered no objection

to the representation of Mr. Bell.

12.     The petitioner provided a written statement acknowledging her guilt and which

stated in part as follows:

> "... I appreciate deeply all the efforts made by the FBI to help me
> and I am extremely apologetic to Special Agent Ryan Pierrot for
> my actions.  This crime has cost me my reputation, my job, my
> savings and my career.  *I face uncertainty as to whether I will be
> allowed to remain living in the United States.  I have hurt deeply
> many persons at Case Western Reserve University who had tried
> to advance my career as a scientist...."*  (Emphasis added).

13.     The petitioner had no realistic chance of being acquitted at trial.  The government

had evidence demonstrating that the petitioner was videotaped placing two of the four notes

under her office door.  When subsequently interviewed by two FBI agents on February 28, 2007,

in a non-custodial setting, she confessed to placing all four notes, giving significant details about

(1:07 CR 228 and
 1:08 CV 31)

how and why she created and placed each note, as indicated in Appendix I, attached hereto.

14.     The petitioner's statement of actual innocence (Doc. 53-1) is unsigned, but if it were to be signed by the petitioner, it lacks credibility with respect to the petitioner's claim of "actual innocence."

15.     Had the petitioner gone to trial, it is the Court's finding that she had no rational defense, would have been convicted and would have faced a longer term of incarceration because she would have been denied acceptance of responsibility resulting in a higher guideline range.

16.     The deposition of testimony of Steven Bell demonstrates that Mr. Bell examined various possible defenses and concluded none was reasonable and informed the petitioner that he would only take the petitioner before the Court and allow her to plead guilty if she told Mr. Bell that she was guilty.  Eventually, the petitioner told Mr. Bell on the day of the guilty plea that she was guilty and would plead guilty.  Then, after her plea of guilty, she reverted to the position that she was not guilty.

17.     Mr. Bell's testimony supports the proposition that the petitioner was advised that her admission of guilt had the possibility of increasing her chances of avoiding deportation.

18.     During the sentencing hearing, it was the goal of Mr. Bell representing the petitioner to obtain a judicial determination that the amount of loss was below $70,000, so as to reduce by two levels the total offense level, and Mr. Bell succeeded in the effort when the Court determined that the loss was less than $70,000, contrary to the position of the government.

19.     The parties entered into a stipulation to the effect that Mr. Brown billed the

29

(1:07 CR 228 and
 1:08 CV 31)

petitioner for services rendered prior to her guilty plea demonstrating that the petitioner and. Mr.

Brown consulted regarding the deportation possibilities in connection with her criminal case.

The text of the stipulation follows: (Doc. 77)

> The parties hereby stipulate that the Defendant, Dr. Ramani [sic]
> Pilla, was billed for services by Attorney Robert Brown, in a bill
> dated sometime in December of 2007 which, at least in part,
> covered services rendered by Attorney Brown to Dr. Pilla in the
> within matter which were performed by Robert Brown prior to Dr.
> Pilla's plea and sentencing hearings.

20.     The petitioner has an impressive curriculum vitae numbering 13 pages, a copy of

which was attached to the Court's Sentencing Memorandum and Opinion and a copy of which is

attached hereto as Appendix II.

21.     During the lengthy deposition of the petitioner taken in connection with these

proceedings on November 17, 2009, and numbering 147 pages, the petitioner's testimony was

inconsistent with and contrary to the representations made by the petitioner when interviewed by

the FBI on February 28, 2007 and attached hereto as Appendix I.

22.     The deposition taken of Steven Bell reflects careful consideration given by Mr.

Bell to all possible defenses in support of the petitioner and his belief that none of the defenses

would be credible, thereby supporting his advice to her that her best opportunity to remain in the

country and avoid deportation was to admit her guilt, if, in fact, she was guilty.[10]

### V.  A Review of the Case Law Involving the Writ of *Corum Nobis*<br>and Guilty Pleas in the Context of Potential Deportation

---

[10]*See* the deposition of Steven Bell taken on December 3, 2009 and filed as Doc. 67 on
January 21, 2010.

30

(1:07 CR 228 and
 1:08 CV 31)

In the case of *United States v. Morgan,* 346 U.S. 542 (1954), the majority recognized a proceeding in the nature of *corum nobis*, and concluded concluded that under the All-Writs section of 28 U.S.C. § 1651(a), the federal district court had the power to issue the writ of *corum nobis*, and in the process, had the power to vacate its judgment of conviction and sentence because the convicted person was entitled to show that his federal conviction was invalid.

Against the background of *United States v. Morgan*, the petitioner relies upon the decision in *United States v. Khalaf*, 116 F. Supp. 2d 210 (D. Mass. 1999) where the district court determined that the petitioner was prejudiced by counsel's deficient performance with respect to a deportation issue and granted the petition after concluding:

> In Petitioner's case, the fact that he was provided false information by defense counsel regarding his plea agreement constitutes a legal infirmity in his conviction.  He agreed to plead guilty with the understanding based on the representation of counsel that the JRAD would protect him against deportation.  Counsel's mistake of law and neglect in failing to read and understand the statute constitutes ineffective assistance of counsel and is a legal basis upon which the writ should issue.

Counsel for the petitioner argues that because of the nature of the crime charged and the amount of restitution alleged in the Information and subsequently determined by the Court to be in excess of $10,000, it was a foregone conclusion that the petitioner would be deported.  In so arguing, counsel for the petitioner relies upon the proposition that when an alien, such as the petitioner, is convicted of an aggravated felony at any time after the alien is admitted to this country, the alien is deportable as required under 8 U.S.C. § 1227(a)(2)(A)(iii) based on a

31

(1:07 CR 228 and
 1:08 CV 31)

conviction for an aggravated felony.[11]  Continuing, counsel for the petitioner relies upon the

provisions of 8 U.S.C. § 1101(A)(43)(M)(i) for the definition of an aggravated felony to include

an offense that involves fraud or deceit in which the loss to the victims exceeds $10,000.[12]

      The guilty plea was entered by the petitioner prior to the major decision of the Supreme

Court of the United States in *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010) which now stands for

the proposition that defense counsel in a criminal case has a constitutional obligation to inform

the client of the potential immigration consequences of a guilty plea.  In *Padilla,* the defense

counsel incorrectly advised the defendant prior to the entry of his guilty plea that the defendant

did not have to worry about his immigration status because of the length of time he had been a

resident in the United States.  The Supreme Court remanded the case to the state court to

consider whether the defendant could demonstrate prejudice as that was an unresolved issue for

the state court.

      Prior to the *Padilla* decision in *Abdel-Karim A. El-Nobani v., United States of America*,

---

[11]8 U.S.C. Section 1227(a)(2)(A)(iii) provides as follows:
    (2) Criminal offenses.
        (A) General Crimes
    ...

    (iii) Aggravated felony.  Any alien who is convicted of an
    aggravated felony at any time after admission is deportable.

[12]8 U.S.C. Section 1101 entitled "Definitions" at (A)(43)(M)(i) provides:
    43.  The term "aggravated felony" means -
        (M) An offense that --
            (i) involves fraud or deceit of which
            the loss to the victim or victims
            exceeds $10,000...

32

(1:07 CR 228 and
 1:08 CV 31)

287 F.3d 417, (6th Cir. 2002), Judge Robert Bell, writing for the circuit, opined:

> [t]he automatic nature of the deportation proceeding does not necessarily make deportation a direct consequence of the guilty plea.  A collateral consequence is one that "remains beyond the control and responsibility of the district court in which the conviction was entered."  *United States v. Gonzalez*, 202 F.3d 20, 27 (1st Cir. 2000).  While this court has not specifically addressed whether deportation consequences are a direct or collateral consequence of a plea, it is clear that deportation is not within the control and responsibility of a district court, and hence, deportation is collateral to a conviction...."  (Emphasis added).

Against the background of *El-Nobani*, counsel for the government contends that the decision in *Padilla*, due to the prior decision of the Supreme Court in *Teague v. Lane*, 489 U.S. 288 (1989), forecloses application of the teachings of *Padilla* to the case at hand.  Consequently, the government contends that the petitioner is not entitled to relief based on the collateral consequences of her guilty plea.

Initially, a review of the *Padilla* decision is appropriate.  Padilla, an alien who had lived in the United States for more than 40 years and served in the United States Army, faced deportation after pleading guilty to the transportation of a large amount of marijuana in his tractor-trailer in the Commonwealth of Pennsylvania.  Padilla claimed in a post-conviction proceeding that his counsel not only failed to advise him of the consequence of his conviction because it was a deportable offense under 8 U.S.C. § 1227(a)(2)(B)(i), but also told him "he did not have to worry about his immigration status since he had been in the country so long."  In the majority decision written by Justice John Paul Stevens, he set forth the proposition that a defense counsel has a duty to advise the client of the immigration consequences of a criminal conviction.

33

(1:07 CR 228 and
 1:08 CV 31)

The Stevens decision states in part as follows:

> ... We granted certiorari, 555 U.S. ___, 129 S. Ct. 1317, 173 L. Ed. 2d 582 (2009) to decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country. We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to automatic deportation. Whether he is entitled to relief depends on whether he has been prejudiced, a matter that we do not address.

> \*\*\*

> The landscape of federal immigration law has changed dramatically over the last 90 years. While once there was only a narrow class of deportable offenses and judges wielded broad discretionary authority to prevent deportation, immigration reforms over time have expanded the class of deportable offenses and limited the authority of judges to alleviate the harsh consequences of deportation. The "drastic measure" of deportation or removal, Fond Haw Tan v. Phelan, 333 U.S. 6, 10, 68 S. Ct. 374, 92 L. Ed. 433 (1948), is now virtually inevitable for a vast number of noncitizens convicted of crimes.

> \*\*\*

> We have long recognized that deportation is a particularly severe "penalty," Fong Yue Ting v. United States, 149 U.S. 698, 740, 13 S. Ct. 1016, 37 L. Ed. 905 (1893); but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature, see INS v. Lopez-Mendoza, 468 U.S. 1032, 1038, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984), deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century, see Part I, *supra*, at 2-7. And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it "most difficult" to divorce the penalty from the conviction in the

34

(1:07 CR 228 and
 1:08 CV 31)

deportation context.  United States v. Russell, 686 F.2d 35, 38, 222
U.S. App. D.C. 313 (CADC 1982).  Moreover, we are quite
confident that noncitizen defendants facing a risk of deportation
for a particular offense find it even more difficult.  See St. Cyr,
533 U.S., at 322, 121 S. Ct. 2271, 150 L. Ed. 2d 347 ("There can
be little doubt that, as a general matter, alien defendants
considering whether to enter into a plea agreement are acutely
aware of the  immigration consequences of their convictions").

Deportation as a consequence of a criminal conviction is, because
of its close connection to the criminal process, uniquely difficult to
classify as either a direct or a collateral consequence.  The
collateral versus direct distinction is thus ill-suited to evaluating a
Strickland claim concerning the specific risk of deportation.  We
conclude that advice regarding deportation is not categorically
removed from the ambit of the Sixth Amendment right to counsel.
Strickland applies to Padilla's claim.

*** 

We too have previously recognized that "'[p]reserving the client's
right to remain in the United States may be more important to the
client than any potential jail sentence.'"  St. Cyr, 533 U.S., at 323,
121 S. Ct. 2271, 150 L. Ed. 2d 347 (quoting 3 Criminal Defense
Techniques §§ 60A.2[2] (1999)).  Likewise, we have recognized
that "preserving the possibility of discretionary relief from
deportation under § 212(c) of the 1952 INA, 66 Stat. 187, repealed
by Congress in 1996, "would have been one of the principal
benefits sought by defendants deciding whether to accept a plea
offer or instead to proceed to trial."  St. Cyr, 533 U.S., at 323, 121
S. Ct. 2271, 150 L. Ed. 2d 347.  We expected that counsel who
were unaware of the discretionary relief measures would "follo[w]
the advice of numerous practice guides" to advise themselves of
the importance of this particular form of discretionary relief.  Ibid,
N. 50.

In the instant case, the terms of the relevant immigration statute are
succinct, clear, and explicit in defining the removal consequence
for Padilla's conviction.  See 8 U.S.C. § 1227(a)(2)(B)(i) (Any
alien who at any time after admission has been convicted of a
violation of (or a conspiracy or attempt to violate) any law or

35

(1:07 CR 228 and
 1:08 CV 31)

regulation of a State, the United States or a foreign country relating to a controlled substance ..., other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable").  Padilla's counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute, which addresses not some broad classification of crimes but specifically commands removal for all controlled substances convictions except for the most trivial of marijuana possession offenses.  Instead, Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country.  This is not a hard case in which to find deficiency: The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect.

Immigration law can be complex, and it is a legal specialty of its own.  Some members of the bar who represent clients facing criminal charges, in either state or federal court or both, may not be well versed in it.  There will, therefore, undoubtedly be numerous situations in which the deportation consequences of a particular plea are unclear or uncertain.  The duty of the private practitioner in such cases is more limited.  When the law is not succinct and straightforward (as it is in many of the scenarios posited by JUSTICE ALITO), a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.  But when the deportation consequence is truly clear, as it was in this case, the duty to give correct advice is equally clear.

***

It is our responsibility under the Constitution to ensure that no criminal defendant -- whether a citizen or not -- is left to the "mercies of incompetent counsel."  Richardson, 397 U.S., at 771, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763.  To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation.  Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

36

(1:07 CR 228 and
1:08 CV 31)

> Taking as true the basis for his motion for postconviction relief, we
> have little difficulty concluding that Padilla has sufficiently alleged
> that his counsel was constitutionally deficient.  Whether Padilla is
> entitled to relief will depend on whether he can demonstrate
> prejudice as a result thereof, a question we do not reach because it
> was not passed on below.  See Verizon Communs., Inc. v. FCC,
> 535 U.S. 467, 530, 122 S. Ct. 1646, 152 L. Ed. 2d 701 (2002).

Justice Alito, in a concurring opinion, declared in part as follows:

> The Court's new approach is particularly problematic because
> providing advice on whether a conviction for a particular offense
> will make an alien removable is often quite complex.  "Most
> crimes affecting immigration status are not specifically mentioned
> by the [Immigration and Nationality Act (INA)], but instead fall
> under a broad category of crimes, such as *crimes involving moral
> turpitude* or *aggravated felonies*."  M. Garcia & L. Eig, CRS
> Report for Congress, Immigration Consequences of Criminal
> Activity (Sept. 20, 2006) (summary) (emphasis in original).  As
> has been widely acknowledged, determining whether a particular
> crime is an "aggravated felony" or a "crime involving moral
> turpitude [(CIMT)]" is not an easy task.  See R. McWhirter, ABA,
> The Criminal Lawyer's Guide to Immigration Law: Questions and
> Answers 128 (2d ed. 2006) (hereinafter ABA Guidebook)
> ("Because of the increased complexity of aggravated felony law,
> this edition devotes a new [30-page] chapter to the subject"); *id*, §
> 5.2, at 146 (stating that the aggravated felony list at 8 U.S.C. §
> 1101(a)(43) is not clear with respect to several of the listed
> categories, that "the term 'aggravated felonies' can include
> misdemeanors," and that the determination of whether a crime is
> an "aggravated felony" is made "even more difficult" because
> "several agencies and courts interpret the statute," including
> Immigration and Customs Enforcement, the Board of Immigration
> Appeals (BIA), and Federal Circuit and district courts considering
> immigration law, the terms 'conviction,' 'moral turpitude,' and
> 'single scheme of criminal misconduct' are terms of art"); *id*. §
> 4.67, at 130 ("[T]he term 'moral turpitude' evades precise
> definition").

> Defense counsel who consults a guidebook on whether a particular
> crime is an "aggravated felony' will often find that the answer is

37

(1:07 CR 228 and
 1:08 CV 31)

not 'easily ascertained."  For example, the ABA Guidebook
answers the question "Does simple possession count as an
aggravated felony?" as follows: "Yes, *at least in the Ninth
Circuit*." § 5.35, at 160 (emphasis added).  After a dizzying
paragraph that attempts to explain the evolution of the Ninth
Circuit's view, the ABA Guidebook continues: "Adding to the
confusion, however, is that the Ninth Circuit has conflicting
opinions depending on the context on whether simply drug
possession constitutes an aggravated felony under 8 U.SC. §
101(a)(43)."  *Id.*, § 5.35, at 161 (citing cases distinguishing
between whether a simply possession offense is an aggravated
felony "for immigration purposes" or for "sentencing purposes").
The ABA Guidebook then proceeds to explain that "attempted
possession," *id.*, § 5.36, at 161 (emphasis added), of a controlled
substance *is* an aggravated felony, while "[c]onviction under the
federal accessory after the fact statute is *probably not* an
aggravated felony, but a conviction for accessory after the fact to
the manufacture of methamphetamine *is* an aggravated felony," *id,*
§ 537, at 161 (emphasis added).  Conspiracy or attempt to commit
drug trafficking are aggravated felonies, but "[s]olicitation is not a
drug-trafficking offense because a generic solicitation offense is
not an offense related to a controlled substance and therefore not
an aggravated felony."  *Id.*, § 5.41, at 162.

                              ***

First, it will not always be easy to tell whether a particular
statutory provisions is "succinct, clear, and explicit."  How can an
attorney who lacks general immigration law expertise be sure that
a seemingly clear statutory provision actually means what it seems
to say when read in isolation?  What if the application of the
provision to a particular case is not clear but a cursory examination
of case law or administrative decisions would provide a definitive
answer?  See Immigration Law and Crimes § 2:1, at 2-2
("Unfortunately, a practitioner or respondent cannot tell easily
whether a conviction is for a removable offense .... [T]he cautious
practitioner or apprehensive respondent will not know
conclusively the future immigration consequences of a guilty
plea").

Second, if defense counsel must provide advice regarding only one

38

(1:07 CR 228 and
 1:08 CV 31)

of the many collateral consequences of a criminal conviction, many defendants are likely to be misled.  To take just one example, a conviction for a particular offense may render an alien excludable but not removed.  If an alien charged with such an offense is advised only that pleading guilty to such an offense will not result in removal, the alien may be induced to enter a guilty plea without realizing that a consequence of the plea is that the alien will be unable to reenter the United States if the alien returns to his or her home country for any reason, such as to visit an elderly parent or to attend a funeral.  See ABA Guidebook §4.14, at 111 ("Often the alien is both *excludable* and *removable*.  At times, however, the lists are different.  Thus, the oddity of an alien that is inadmissable but not deportable.  This alien should not leave the United States because the government will not let him back in" (emphasis in original)).  Incomplete legal advice may be worse than no advice at all because it may mislead and may dissuade the client from seeking advice from a more knowledgeable source.

*** 

In sum, a criminal defense attorney should not be required to provide advice on immigration law, a complex specialty that generally lies outside the scope of a criminal defense attorney's expertise.  On the other hand, any competent criminal defense attorney should appreciate the extraordinary importance that the risk of removal might have in the client's determination whether to enter a guilty plea.  Accordingly, unreasonable and incorrect information concerning the risk of removal can give rise to an ineffectiveness claim.  In addition, silence alone is not enough to satisfy counsel's duty to assist the client.  Instead, an alien defendant's <u>Sixth Amendment</u> right to counsel is satisfied if defense counsel advises the client that a conviction may have immigration consequences, that immigration law is a specialized field, that the attorney is not an immigration lawyer, and that the client should consult an immigration specialist if the client wants advice on that subject.

### VI.  Does the Decision in *Padilla v. Kentucky* Constitute A New Rule In the Context of *Teague v. Lane* as Claimed by the Government?

*Teague v. Lane*, 489 U.S. 288 (1989) presents the issue of whether a ruling by the

39

(1:07 CR 228 and
 1:08 CV 31)

Supreme Court with respect to issues in the context of criminal prosecutions have retroactive

consequences.  *Teague* teaches that if the pronouncement of the court constitutes a new rule and

is not given retroactive application by the Supreme Court as to other cases, the pronouncement

of the Supreme Court does not have application to other cases, especially where the action before

the district court involves a collateral proceeding such as an action in habeas corpus, and in the

Court's view, an application for a writ of *corum nobis*.  *Padilla v. Kentucky* with respect to the

issue of retroactivity, has been the subject of a number of recent district court decisions and the

district courts have disagreed on the issue of retroactivity.  For instance, *see United States v.

Chaidez*, - F. Supp. 2d - (2010 WL 3184150 (N.D. Ill.); *United States v. Hubenig*, 2010 WL

2650625 (E.D. Cal.); *Michael Haddad v. United States*, 2101 WL 2884645 (E.D. Mich.);

*Mamadou Gacko v. United States of America*, 2010 WL 2076020 (E.D. N. Y.); and *United States

v. Wilmar Obonaga*, 2010 WL 2629748 (E.D. N.Y).  Without describing the ruling of each of the

district courts on the issue of retroactivity of *Padilla v. Kentucky*, the decisions reached contrary

conclusions.

The Court, after considering the briefs of the petitioner and the government, and after

reading the case law that preceded the Supreme Court's announcement in *Padilla v. Kentucky*, as

well as the text of the decision in *Padilla v. Kentucky*, is of the view, and so declares for the

purpose of this decision, that *Padilla v. Kentucky* announced a new rule of law.  Consequently,

the new instructions of the Supreme Court requiring counsel to advise non-citizen defendants of

the risk of deportation, if convicted, does not apply to this case as the plea of guilty was entered

prior to the decision in *Padilla v. Kentucky*.

40

(1:07 CR 228 and
 1:08 CV 31)

If the Court is correct in that determination, then the petitioner is not entitled to relief.

However, the Court will continue with other potential scenarios against the background of the

possibility that a higher court, i.e. the Sixth Circuit or the Supreme Court, might well disagree

with this Court's analysis of the new rule application.

> VII.  If the Court Assumes the Teachings of *Padilla v. Kentucky*
> Apply to the Advice Given by the Petitioner's Trial Counsel,
> Did the Instructions of Steven Bell Regarding the Issue of Possible
> Deportation Conformto the Teachings of *Padilla v. Kentucky?*

Initially, the Court turns to a reexamination of Justice Stevens' decision in *Padilla* where

he stated, in part, as follows:

> ...  We agree with *Padilla* that constitutionally competent counsel
> would have advised him that his conviction for drug distribution
> made him subject to automatic deportation.

A review of Justice Stevens' decision sheds little light on whether petitioner's trial

counsel, Steven Bell, satisfied the teachings of *Padilla* by directing his client to an apparent

expert on immigration law prior to the entry of the guilty plea.

Again, the Court turns to the teachings of Justice Stevens where he states, in part, as

follows:

> Padilla's counsel could have easily determined that his plea would
> make him eligible for deportation simply from reading the text of
> the statute, which addresses not some broad classification of
> crimes but specifically commands removal for all controlled
> substances convictions except for the most trivial of marijuana
> possession offenses.  Instead, Padilla's counsel provided him false
> assurance that his conviction would not result in his removal from
> this country.  This is not a hard case in which to find deficiency:
> The consequences of Padilla's plea could easily be determined
> from reading the removal statute, his deportation was

41

(1:07 CR 228 and
 1:08 CV 31)

presumptively mandatory, and his counsel's advice was incorrect.
(Emphasis added).

Immigration law can be complex, and it is a legal specialty of its
own.  Some members of the bar who represent clients facing
criminal charges, in either state or federal court or both, may not
be well versed in it.  There will, therefore, undoubtedly be
numerous situations in which the deportation consequences of a
particular plea are unclear or uncertain.  The duty of the private
practitioner in such cases is more limited.  When the law is not
succinct and straightforward (as it is in many of the scenarios
posited by JUSTICE ALITO, a criminal defense attorney need do
no more than advise a noncitizen client that pending criminal
charges may carry a risk of adverse immigration consequences.
But when the deportation consequence is truly clear, as it was in
this case, the duty to give correct advice is equally clear.
(Emphasis added).

Early on in his representation of the petitioner, Steven Bell, without the guidance of

*Padilla v. Kentucky*, nevertheless, directed the petitioner to consult with a lawyer apparently

versed in immigration law.  *See* fact findings 3, 4, 5 and 6.  After considering the interplay

between the commentary of Justice Stevens and Justice Alito, the Court finds it difficult to

determine whether the representation of the petitioner by Steven Bell on the issue of deportation

meets the teachings of *Padilla* as expressed by Justice Stevens.

The interplay between Justice Stevens' commentary concerning obvious deportation

consequences, and Justice Alito's concern that immigration law presents situations in which the

deportation consequence of a particular plea are unclear or uncertain, presents new issues for

district courts attempting to analyze the responsibility of defense counsel in a potential

deportation situation.  If one assumes, consistent with the petitioner's argument, that the

interplay between 8 U.S.C. § 1227(a)(2)(A)(iii) and 8 U.S.C. § 1101(A)(43)(M)(i) considered in

42

(1:07 CR 228 and
 1:08 CV 31)

light of the allegations in the Information with a allegation of the losses in excess of $10,000,

made it clearly obvious that the petitioner would be deported if convicted of the charge in the

Information, and that such interplay of the above-two sections should have made it obvious to

petitioner's trial counsel, Steven Bell, as reflected in Justice Stevens' reliance on the obvious

nature of a pending criminal charge to the affect, that the petitioner would be deported if she

entered a plea of guilty, then the performance of Steven Bell constitutes a violation of the

teachings in *Padilla v. Kentucky*, assuming that that decision did not establish a new rule of law.

In the Court's view, it is a close call with respect to the conduct of Steven Bell and

whether it violated the subsequent teachings of *Padilla,* assuming its application to this case.

The Court recognizes that Steven Bell, from the outset, placed the petitioner in contact with an

immigration lawyer in view that his understanding of immigration law was not a subject with

which he was familiar, and thus, his advice to the petitioner that she consult with Attorney

Robert Brown arguably satisfied his *Strickland v. Washington* requirement that he provide his

client, the petitioner, with effective representation.  It is apparent that Steven Bell did not engage

in a study of the two applicable statutory provisions mandating deportation.  As the Court is of

the view, as subsequently discussed, that the petitioner is unable to show prejudice, it is not

necessary for the Court to decide whether Steven Bell's advice satisfied the teachings of *Padilla*

*v. Kentucky*.

VIII.  Did the Advice of Attorney Robert Brown to the
Petitioner Concerning the Subject of Deportation
Comply With The Teachings of *Padilla v. Kentucky*?

The Court is of the view, and so declares, that petitioner's civil attorney, Robert Brown,

43

(1:07 CR 228 and
 1:08 CV 31)

having been advised of the nature of the allegations in the proposed Information and given his

expertise in immigration law, should have come to the conclusion, after considering the

allegations in the proposed Information and the interplay between 8 U.S.C. § 1227(a)(2)(A)(iii)

and 8 U.S.C. § 1101(A)(43)(M)(i) and the allegations in the Information, that if the petitioner

elected to enter a plea of guilty, she would have been subject to deportation.  The question that

remains, and which the Court next addresses, is the consequence of Attorney Brown's advice.

### IX.  If The Court Finds That Steven Bell, Pursuant to the Teachings of *Padilla v. Kentucky*,  Discharged His Obligation to Provide Competent Advice to His Client By Recommending That She Consult with Attorney Robert Brown With Respect to Deportation Issues, and Assuming that the Advice of Attorney Robert Brown Failed to Comply with the Teachings of *Padilla v. Kentucky*, Is The Petitioner Entitled to a Writ of *Corum Nobis* Because of the Ineffective Assistance of Her Civil Lawyer, Robert Brown?

The Court finds nothing in the teachings of *Padilla v. Kentucky* that support relief to the

petitioner by way of the granting of a writ of *corum nobis* based on advice from her civil lawyer.

The Court finds no authority for the proposition that a defendant's right to competent counsel,

when charged with criminal conduct, extends to advice provided by a lawyer who is not directly

involved in the client's defense.

44

(1:07 CR 228 and
 1:08 CV 31)

<u>X.  If it is Determined, After Consideration of the Totality of the
Circumstances That the Petitioner's Right to the Effective Assistance
of Counsel In the Context of *Strickland v. Washington*
and the Teachings of *Padilla v. Kentucky* Was Violated,
Has The Petitioner Established The Second Prong of
*Strickland v. Washington*, i.e., Prejudice?</u>

The Court agrees with counsel for the government that the teachings of *Hill v. Lockhart*.

474, U.S.C. 474, U.S. 52 (1985) apply.  *Hill* teaches that to demonstrate prejudice, a defendant

must show that "counsel constitutionally affected the outcome of the plea process" and that such

a competently counseled defendant "would not have pleaded guilty and would have insisted in

going to trial."

The prejudice inquiry is an objective one, asking whether, if given competent advice

about the chances of prevailing in a trial, "a rational defendant [would have] insist[ed] on going

to trial."  See, e.g., *Roe v. Flores-Ortega*, 528 U.S. 470, 486 (2000) (citing *Hill*).  *Meyer v.

Branker*, 506 F.3d 358, 369 (4th Cir. 2007) teaches:

> The *Strickland* approach applies in the context of a guilty plea, and
> the Supreme Court has clarified the contours of the "prejudice"
> standard for a situation when there is no trial.  In *Hill v. Lckhart*,
> 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), the Court held
> that, in the plea context, counsel's deficient performance is
> prejudicial only if "there is a reasonable probability that, for
> counsel's errors, [the defendant] would not have pleaded guilty
> and would have insisted on going to trial."  *Hill* 474 U.S. 59, 106
> S.Ct. 366.  <u>This is an objective inquiry, *see Hooper v. Garraghty*,
> 845 F.2d 471, 475 (4th Cir. 1988), and dependant on the likely
> outcome of a trial had the defendant not pleaded guilty.  *Hill*, 474
> U.S. at 59-60, 106 S.Ct. 366.</u>  (Emphasis added).

After considering the totality of the circumstances and specifically fact finding number

13, the Court finds that the defendant is unable to support the second prejudice prong of

(1:07 CR 228 and
 1:08 CV 31)

*Strickland v. Washington*, and thus is unable to establish prejudice assuming that the advice of

counsel, be it either the advice of Steven Bell or Robert Brown, or a combination thereof, denied

her the effective assistance of counsel with respect to the issue of deportation.

XI.  Conclusion

The Court's specific rulings, which support the denial of a writ of *corum nobis*, in

separate scenarios, follow:

1.        The decision in *Padilla v. Kentucky* announces a new rule.  It is not applicable to

the case at hand, and thus, the petitioner is not entitled to relief.

2.        However, if the decision in *Padilla v. Kentucky* applies, it applies only to advice

by the lawyer representing the defendant in the criminal case, but not to advice given by a civil

lawyer holding himself out as an expert in immigration law.

3.        If *Padilla v. Kentucky* applies, and it is determined that the advice by Attorney

Brown failed to connect the applicability of the two statutes 8 U.S.C. § 1227(a)(2)(A)(iii) and 8

U.S.C. § 1101(A)(43)(M)(i) and was therefore inadequate in the context of *Padilla v. Kentucky*,

the teachings of *Padilla v. Kentucky* do not benefit the petitioner because the mandate of *Padilla

v. Kentucky* does not extend to advice received from a lawyer not directly charged with the

defense of the petitioner-defendant.

4.        If *Padilla v. Kentucky* applies, and although it is a close call, the Court is of the

view that the advice given by Attorney Steven Bell to seek out the advice of an attorney

specializing in immigration law satisfied the dictate of *Padilla v. Kentucky*.  So holding, the

Court finds that a lawyer specializing in criminal law and not in immigration law should not be

46

(1:07 CR 228 and
 1:08 CV 31)

held to a standard which requires the criminal lawyer to understand the interplay between 8

U.S.C. § 1227(a)(2)(A)(iii) and 8 U.S.C. § 1101(A)(43)(M)(i).  If one were to determine that

petitioner's criminal lawyer, Steven Bell, independently of any advice from an immigration

lawyer, by an independent study of the two inter-related statutes against the background of the

allegations in the Information, should have recognized that the petitioner's plea of guilty would

subject her to deportation, then the issue of prejudice, as herein after discussed, would become

relevant.

     5.     If *Padilla v. Kentucky* applies, and is applicable to a collateral proceeding such as

a petition for a writ of *corum norbis*, and the petitioner's criminal lawyer is bound by the advice

from the immigration lawyer, and the failure to anticipate the application of the interplay

between the two sections of immigration law, 8 U.S.C. §1227(a)(2)(A)(iii) and 8 U.S.C. §

1101(a)(43)(M)(i) as reasonably applied to the charge set forth in the Information, thus satisfying

the first requirement of a *Strickland v. Washington* analysis, and after considering the entire

record, in this case, the petitioner has failed to establish the prejudice requirement of *Strickland.*

     As a result of the Court's consideration and rulings on the above-described five

scenarios, the Court finds that there is no basis on which to grant the petition for *corum norbis*

and the Court will publish a judgment entry ruling for the government on the petitioner's petition

for a writ of *corum nobis*.

     Consequently, the Court finds, under the foregoing analysis, that the petitioner is not

47

(1:07 CR 228 and
 1:08 CV 31)

entitled to the writ of *corum nobis* and will publish an entry granting judgment to the

government.


IT IS SO ORDERED.


  August 20, 2010                          */s/ David D. Dowd, Jr.*          
Date                                            David D. Dowd, Jr.
                                            U.S. District Judge

48

FD-302 (Rev. 10-6-95)

APPENDIX I

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    03/01/2007

RAMANI S. PILLA (previously interviewed) was interviewed at the Cleveland Division of the Federal Bureau of Investigation. After being advised of the identities of the interviewing agents and the nature of the interview, PILLA provided the following information:

PILLA provided interviewing agents copies of various documents.  Included with the documents was a copy of a complaint PILLA made because she felt discriminated against.  The complaint was made to a hotline maintained by a company independent from CASE WESTERN RESERVE UNIVERSITY (CWRU).  The complaint was against JAIYANG SUN, JOSEPH SEDRANSK, WOJBOR WOYCZYNSKI, JAMES ALEXANDER, and MARK TURNER.  The complaint was made anonymously, but when PILLA asked for a copy, she was told she needed to identify herself.  The copy was sent to her email at the university even though she explicitly asked that the copy be sent to her home address.  When she found out the status of her complaint, she was told they saw no discrimination.  PILLA has piles of stuff she has collected over the years at her home.

In 2005, PILLA got a job offer from another university. Dean SILAS TAYLOR set up a meeting to discuss the offer she received with the Provost MARK TURNER.  Instead of getting a counter offer, PILLA was given a terminal contract.  TURNER said "I urge you to leave quickly."

PILLA also complained to the National Science Foundation's (NSF) Inspector General's office.  JOE KOONCE and TAYLOR told the Provost and Deputy Provost that PILLA made this complaint.  Then, she was told to contact the Department of Education, but was told they would not deal with her complaint.

PILLA attended EEOC mediation in July, 2006.  After that meeting, she noticed that someone had been in her office because her air conditioning had been shut off.

PILLA told interviewing agents "me filing complaints made someone angry."

When asked again when the last time PILLA went to Yost 338 prior to Saturday, February 24, 2007, PILLA responded February

---

Investigation on   02/28/2007   at  Cleveland, Ohio

File # 44B-CV-72837  — 14

Date dictated

SA JENNIFER A. BOYER;jab
by   SA RYAN J. PIERROT

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT A

FD-302a (Rev. 10-6-95)

44B-CV-72837

Continuation of FD-302 of _____RAMANI S. PILLA_____ , On 02/28/2007 , Page  2

2, 2007, was the last day she went to that office.  She remembers
the date because that was the date the camera was installed in her
office.  She returned to the office February 24, 2007, and found
the fourth threatening note.  She went to her office straight from
the airport.  She had been at a job interview at the University of
South Carolina.  On her way back from the airport, PILLA left a
voice mail for KOONCE.  At some point, she also called Dean TAYLOR
and asked him how is it possible to work under these circumstances.
She is very stressed and wants to quit, but truly loves what she
does.  Since she filed her complaints against the university,
things have gotten worse and PILLA believes it relates to the
notes.

When PILLA was confronted about the notes, she admitted
that she created the notes and slid each one under her own office
door.  When shown surveillance photos from February 21, 2007,
showed PILLA sliding the last note under her door, PILLA admitted
that it was her.

When asked why she wrote threatening notes to herself,
PILLA said she has been under so much stress and she wanted to be
out of the Statistics Department.  Before returning to CWRU in
August, 2006, KOONCE told PILLA not to come back and that there was
no future for her at CWRU.  Right after PILLA returned from
STANFORD UNIVERSITY in August, 2006, KOONCE told her a senior
faculty accused her of being a plagiarist.  Members of the
Statistics Department excluded her from everything and destroyed
her career.  There is no way PILLA can get promotion and tenure.
PILLA wanted peace of mind and to be out of the Statistics
Department, so she wrote the first note.  She thought if CWRU
became aware of the note, she would get out of the Statistics
Department.  PILLA could not recall if she wrote the note at home
or at her office at CWRU.  She used the word "bitch" because some
of the senior faculty really hate her and someone said she was a
bitch and did not deserve tenure.  The day she put the note under
her door was probably not the same day she called KOONCE to report
it.

The second note was possibly fabricated at PILLA's home.
It was prompted by several incidents.  PILLA did not have access to
her grants or statements and was not getting paid.  Whenever she
asked someone to do something for her, it did not get done.  PILLA
had also spent a lot of time prepping for a spring course to find
out, even though she had worked so hard, she could not teach the
course.  At the same time, another professor, PETER THOMAS, had a

FD-302a (Rev. 10-6-95)

44B-CV-72837

Continuation of FD-302 of ___RAMANI S. PILLA_____ , On 02/28/2007 , Page ___3___

much easier time getting his course approved.  PILLA worried about
these events effecting her NSF award.  The department eliminated
her from everything, including service duties, benefits, resources.
Additionally, graduate students came to know that PILLA was
terminated in 2005.  These events culminated in PILLA writing the
second note.

　　　The third note was made using text editor on PILLA's
Apple computer at home.  PILLA made this note after WOYCZYNSKI told
a mathematician, MARY BARCLAY (phonetic) that PILLA plagiarized
four pages of SUN's paper.

　　　PILLA created the last note after she tried to recruit a
post-doc student using her NSF Career Award.  Because of her
terminal contract, PILLA could not recruit PhD students.  She
attempted to use her grant funds to get a post-doc.  The university
sent a letter to NSF saying it was PILLA's fault she did not
recruit PhD students.

　　　PILLA did not plan or think things through before making
and planting the letters.  There was no big master plan.  She just
did it.  She wanted to portray the reality of her situation, so
people on the outside could see the hostile environment she was
working in.

　　　PILLA acknowledged that she filed a sealed anonymous
complaint against CWRU in court because of the letters.  PILLA said
her attorney DENISE KNECHT wanted to do this.  KNECHT did not know
PILLA wrote the letters herself.  PILLA denied that her civil law
suit against CWRU motivated her to make and plant the letters.
KNECHT began representing PILLA in May, 2006.  In July, 2005, SILAS
TAYLOR recommended PILLA get an attorney.  Her first attorney was
ANDREW MARGOLIS (phonetic).  He handled communicating with CWRU
attorneys regarding her terminal contract and not being treated
fairly with respect to tenure.  PILLA switched attorneys before her
EEOC mediation because KNECHT had more expertise in discrimination
cases.

　　　PILLA was asked by interviewing agents to sign a written
statement.  After the statement was drafted, PILLA declined to sign
it.  PILLA said she is sorry for what she did.

　　　The documents provided to interviewing agents by PILLA
will be maintained in the 1A section of the case file.

## Curriculum Vitae
### Ramani S. Pilla

Case Western Reserve University (CWRU)    Affiliate Member, KIPAC, Stanford University
**E-mail:** pilla@slac.stanford.edu

## Research Interests

- ♦ Boundary Crossing Problems ♦ Correlated Data (Estimating Equation/Likelihood Approaches)
- ♦ Local Likelihood ♦ Non/Semi-Parametric Mixture Models (Estimation/Testing/Model Selection)
- ♦ Random Fields ♦ Spatial Statistics ♦ Statistical Computation/Data Mining
- ♦ Application Areas: Bioinformatics/Genetics, Biology, Imaging, Astro/Particle/High-Energy Physics

## Professional Experience

| | |
|---|---|
| **Affiliate Member** | Fall 2006–Present |
| Kavli Institute for Particle Astrophysics and Cosmology (KIPAC), **Stanford University** | |
| **Visiting Scholar** | Summer 2006 |
| Department of Statistics, **Stanford University** | |
| **Visiting Scholar** | Summer 2006 |
| KIPAC-Stanford Linear Accelerator Center (**SLAC**), **Stanford University** | |
| **Assistant Professor** | July 2002–Present |
| Department of Statistics & Department of Biology[1], **Case Western Reserve University** | |
| **Visiting Professor** | July–August 2003 |
| Department of Statistics, **University of Perugia**, Italy | |
| **Assistant Professor of Biostatistics** | Fall 2000–July 2002 |
| **University of Illinois**, Chicago | |
| **Visiting Fellow** | Fall 1997–Fall 2000 |
| National Institute of Child Health & Human Development, **National Institutes of Health** | |
| **Pre-Doctoral Lecturer** | Summer 1993; Summer 1994–Fall 1997 |
| Department of Statistics, **Pennsylvania State University** | |
| **Research Assistant** | 1996–1997 |
| Department of Statistics, **Pennsylvania State University** | |

## Highest Degree Earned

| | |
|---|---|
| Ph.D., Statistics, Department of Statistics, **Pennsylvania State University** | 1997 |
| Advisor: Distinguished Professor Bruce G. Lindsay | |

## Publications

### Peer Reviewed Publications (including under review)

- ♦ **Pilla, R.S.**, Kim, Y. & Lee, H.B. (2007). "On Casting Random Effects Models in a Survival Framework", *J. of Royal Statistical Society-Series B*, in press.
- ♦ Loader, C. & **Pilla, R.S.** (2007). "Iteratively Reweighted Generalized Least Squares for Estimation and Testing with Correlated Data: An Inference Function Framework", *J. of Computational & Graphical Statistics*, in press.

---

[1]Secondary Appointment in Biology started in January 2004.



Exhibit 11

♦ Charnigo[2], R. & **Pilla, R.S.** (2007). "Semiparametric Mixtures of Generalized Exponential Families", *Scandinavian J. Statistics*, 34, 535–551. (Published on-line in 2006 under doi:10.1111/j.1467-9469.2006.00532.x.)

♦ **Pilla, R.S.** & Charnigo[2], R. (2007). "Consistent Estimation and Model Selection in Semiparametric Mixtures", under review.

♦ Goldman, M.B., Wood, G., Goldman, M.B., Gavin, M., Paul S., Zaheer, S., Fayyaz, G. & **Pilla, R.S.** (2007). "Diminished Glucocorticoid Negative Feedback in Polydipsic Hyponatremic Schizophrenic Patients", *J. Clinical Endocrinology and Metabolism*, 92, 698–704.

♦ Goldman, M.B., Heidinger, L., Kulkarni, K., McLaren, D.G., Zhu, D.C., Chien, A., Shah, J., Coffey, C.E., Sharif, S., Chen, E., Uftring, S.J., Small, S.L., Solodkin, A. & **Pilla, R.S.** (2006). "Changes in the Amplitude and Timing of the Hemodynamic Response Associated with Prepulse Inhibition of Acoustic Startle", *Neuroimage*, 32, 1375–1384.

♦ **Pilla, R.S.**, Qu, A. & Loader, C. (2006). "Testing for Order Restricted Hypotheses in Longitudinal Data", *J. of Royal Statistical Society-Series B*, 68, 437–455.

♦ Blevins[3], M. & **Pilla, R.S.** (2006). "Deviance Information Criterion for Bayesian Structure Learning", under review.

♦ **Pilla, R.S.**, Bartolucci, F. & Lindsay, B.G. (2006). "Model Building for Semiparametric Mixtures", E-print Archive-*arXiv:math.ST/0606077*.

♦ **Pilla, R.S.** & Loader, C. (2005). "Inference in Perturbation Models, Finite Mixtures and Scan Statistics: The Volume-of-Tube Formula", E-print Archive-*arXiv:math.ST/0511503*.

♦ **Pilla, R.S.** (2005). "Inference Under Convex Cone Alternatives for Correlated Data", E-print Archive-*arXiv:math.ST/0506522*.

♦ **Pilla, R.S.** & Loader, C. (2005). "On Large-Sample Estimation and Testing via Quadratic Inference Functions for Correlated Data", E-print Archive-arXiv-*arXiv:math.ST/0505360*.

♦ **Pilla, R.S.**, Loader, C. & Taylor, C.C. (2005)[4]. "New Technique for Finding Needles in Haystacks: Geometric Approach to Distinguishing Between a New Source and Random Fluctuations", *Physical Review Letters*, 95, 230202-1–230202-4.

♦ **Pilla, R.S.**, Kitska[5], D. & Loader, C. (2005). "Statistical Analysis of Modified Complete Randomized Designs: Applications to Chemo-Orientation Studies", *J. of Experimental Biology*, 208, 1267–1276.

♦ **Pilla, R.S.**, Tao[6], P. & Priebe, C.E. (2003)[7]. "Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixture Models", *J. of Computational & Graphical Statistics*, 12: 332–353.

♦ **Pilla, R.S.** & Lindsay, B.G. (2001)[8]. "Alternative EM Methods for Nonparametric Finite Mixtures", *Biometrika*, 88: 535–550.

♦ **Pilla, R.S.**, Kamarthi, S.V. & Lindsay, B.G. (2001). "Aitken-Based Acceleration Methods for Assessing Convergence of Multilayer Neural Networks", *IEEE Transactions on Neural Networks*, 12: 998–1012.

[2]Initiated projects while Charnigo was Ph.D. Candidate at Department of Statistics, CWRU; graduated Summer 2003.
[3]This work is based on her M.S. thesis, Department of Statistics, CWRU.
[4]This work received national/international press coverage in 2005 and 2006.
[5]Duration of the project, he was Ph.D. Candidate at Department of Statistics, CWRU; primary supervisor on the project.
[6]Duration of the project, he was Ph.D. Candidate at Johns Hopkins University; primary supervisor on the project.
[7]Selected as **Best of J. of Computational & Graphical Statistics** by the Editor, 2003.
[8]Received **Student Paper Award** from *American Statistical Association*, 1997.

◆ Nansel, T.R., Overpeck, M., **Pilla, R.S.**, W.J. Ruan, B. Simons-Morton & P. Scheidt (2001)[9]. "Bullying Behaviors Among US Youth: Prevalence and Association with Psychological Adjustment", *J. of American Medical Association*, 285: 2094–2100.

◆ Lindsay, B.G., **Pilla, R.S.** & Basak, P. (2000). "Moment-Based Approximations of Distribution Using Mixtures: Theory and Applications", *Annals of the Institute of Statistical Mathematics*, 52: 215–230.

◆ **Pilla, R.S.**, Kamarthi, S.V. & Lindsay, B.G. (2000). "An Extended Aitken Acceleration Method to Assess the Convergence in Multilayer Neural Networks", *Intelligent Engineering Systems Through Artificial Neural Networks*, C.H. Dagli, A.L. Buczak, J. Ghosh, M.J. Embrechts, O. Ersoy & S. Kercel (Eds.), 10: 139–146. New York: ASME Press.

◆ **Pilla, R.S.** & Lindsay, B.G. (2000). "Assessing Convergence in High-Dimensional Optimization Problems: Application to Neural Networks", *2nd ICSC Symposium on Neural Computation*, H. Bothe & R. Rojas (Eds.), pp. 102–108. Canada/Switzerland: ICSC Academic Press.

◆ **Pilla, R.S.** & Lindsay, B.G. (1996). "Conjugate Gradient Related Methods: Application to Neural Networks", *SIAM Proceedings Series List, Linear and Nonlinear Conjugate Gradient Related Methods Abstracts*. Sponsored by AMS, IMS & SIAM.

◆ **Pilla, R.S.**, Kamarthi, S.V. & Lindsay, B.G. (1995)[10]. "Convergence Behavior of an Iterative Process: Applications to Neural Networks", *Intelligent Engineering Systems Through Artificial Neural Networks*, C.H. Dagli, M. Akay, C.L.P. Chen, B.R. Fernandez & J. Ghosh (Eds.), 5: 147–152. New York: ASME Press.

**Peer Reviewed Book Volume**

◆ Goldsmith, S.K., Pellmar, T.C., Kleinman, A.M. & Bunney, W.E. (Eds.) (2002). *Reducing Suicide: A National Imperative*, National Academies Press. Contributed to Chapter 10 and Appendix A; joint with R. Gibbons & K. Hur.

**Book/Research Monograph (In Preparation)**

◆ Loader, C. & **Pilla, R.S.** (Alphabetical Authorship) *Statistical Inference Using Spherical Geometry: Theory, Computations and Applications*, to be published by Springer Series in Statistics in 2008.

**Peer Relviewed Invited Article**

◆ **Pilla, R.S.** (1997). "Teaching Philosophy", *Penn State Teacher II—Learning to Teach, Teaching to Learn*[11], D.M. Enerson, R.N. Johnson, S. Miller & K.M. Plank (Eds.), pp. 191–192. University Park, PA.

**Dissertation**

◆ **Pilla, R.S.** (1997). "Improving the Rate of Convergence of EM in High-Dimensional Finite Mixtures", *Ph.D. Dissertation*, Department of Statistics, Pennsylvania State University.

**Proceedings**

◆ **Pilla, R.S.** & Lindsay, B.G. (1996). "Faster EM Methods in High-Dimensional Finite Mixtures", *Proceedings of the Statistical Computing Section, American Statistical Association*, pp. 166–171.

◆ **Pilla, R.S.**, Kamarthi, S.V. & Lindsay, B.G. (1995b). "Application of Aitken Acceleration Method to Neural Networks", *Computing Science and Statistics: Proceedings of the Twenty-Seventh Symposium, Interface*, 27: 332–336.

---

[9]This work received national press coverage in 2001.

[10]Received **Theoretical Development Award** from *Artificial Neural Networks in Engineering*, 1995.

[11]Used as a guide by the faculty and instructors at Penn State interested in enhancing their teaching skills.

*Ramani S. Pilla* 4

## Recent Grants

- ◆ **National Science Foundation:** PI (Solo Investigator), **CAREER: New Directions in Mixture Models and their Applications.** Statistics & Probability Program; Division of Mathematical Sciences, 7/03–6/08, $400,000.
- ◆ **Office of Naval Research:** PI (Solo Investigator), **Geometric Methods for High-Dimensional Data Clustering, Pattern Recognition and Signal Detection,** Probability & Statistics Program; Mathematical, Computer, Information Sciences Division, 11/05–9/08, $450,000.
- ◆ **National Science Foundation:** Co-PI (PI: Snyder), UBM: Interdisciplinary Training for Undergraduates in Biological and Mathematical Sciences, 1/07–12/10, $239,995.
- ◆ **Office of Naval Research:** PI (Solo Investigator), **Adaptive Methods for Spatial Scan Analysis via Mixture Models,** Probability & Statistics Program; Mathematical, Computer, Information Sciences Division, 6/02–5/06, $231,818.
- ◆ **National Science Foundation-ADVANCE Opportunity Grant:** PI (Solo Investigator), through the Academic Careers in Engineering and Science (ACES), Case Western Reserve University. Monograph Writing: Statistical Inference Using Volume of Tubes: Geometry, Theory and Applications, 1/06–7/07, $17,000.
- ◆ **UCITE Glennan[12] Grant:** PI (Solo Investigator), **Understanding Biological Complexity via Modern Statistical Methods,** University Center for Innovation in Teaching and Education (UCITE), CWRU, 8/04–7/05, $6,500.
- ◆ **Office of Naval Research:** PI (Co-PI, Loader), **Topics in Statistical Model Building: Mixture Models and Local Likelihood,** Probability & Statistics Program, Mathematical, Computer, Information Sciences Division, 4/04–12/05, $80,000.

## Awards and Honors

- ◆ **Affiliate Member:** Kavli Institute for Particle Astrophysics and Cosmology (KIPAC), Stanford University, since Fall 2006.
- ◆ **NSF CAREER Award:** 2003–2008. [*One of the three statistics junior faculty selected from the nation for the year 2003.*]
- ◆ **Collaborative Research Featured:** Research with Loader & Taylor on *Powerful Statistical Tools Enhance the Ability to Find Needles in a Haystack,* featured in *Value of Research,* published by *Office of Research and Technology Management,* CWRU, Cleveland, OH, vol. 2, p. 38, 2005.
- ◆ **JCGS** (*J. of Computational & Graphical Statistics*) **Editor's Invited Paper:** Invited to present award winning paper *Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixture Models,* Interface, March 2003.

### National Media Features/Press Release

- ◆ **Press Release in 2006:** Pilla, Loader & Taylor (2005) *Physical Review Letters* article received press coverage by the NRE Navigator, September 2006 issue and R&D Magazine January 2006 issue.
- ◆ **Press Release in 2005:** Pilla, Loader & Taylor (2005) *Physical Review Letters* article received press coverage by Eureka Alert, Science Daily, PhysOrg, Innovations Report, United Press International etc. University Press Release (CWRU Home Page, College of Arts & Sciences Home Page) at http://www.case.edu/news/2005/12-05/haystack.htm.

---

[12]Under circumstances in the Department/College, could not proceed with the development of the inter-disciplinary course and hence could not accept the award.

♦ **Media Features in 2001:** Nansel, T.R., Overpeck, M., **Pilla, R.S.** et al. (2001) *J. of American Medical Association* article received coverage by the New York Times, Washington Post, LA Times, CNN, NPR & NBC etc.

**Teaching Award Nominations**

♦ **Nominated to 2005-2006 John S. Diekhoff Graduate Teaching Award:** Nominated by graduate student(s)—award recognizes outstanding contributions to the education of graduate students at CWRU through work in the classroom and as an advisor, March 2006.

♦ **Nominated to 2004-2005 Carl F. Wittke Award for Excellence in Undergraduate Teaching:** Nominated by undergraduate student(s) for the 2005 Wittke Award, CWRU, March 2005.

**Publication Awards**

♦ **Best of JCGS Award:** For *Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixture Models.* [One of the three selected in 2003.]

♦ **Student Paper Award:** Paper based on Ph.D. dissertation; by Statistical Computing Section of *American Statistical Association* (ASA), 1997. Received ● Cash award from ASA to present in Special Session, Joint Statistical Meetings, 1997. ● Invited to Publish in special section of *JCGS.*

♦ **Theoretical Development Award:** By Artificial Neural Networks in Engineering for *Convergence Behavior of an Iterative Process: Applications to Neural Networks,* 1995. *Third* place among 165 peer reviewed papers. Invited to Publish in *International J. of Smart Engineering System Design.*

**Recent Fellowships**

♦ **Glennan Fellow**[13]**:** 2004–2005. Given by University Center for Innovation in Teaching and Education (UCITE), CWRU, rewarding excellence in junior faculty and to facilitating their growth as teacher-scholars.

♦ **National Institutes of Health Fellowship:** 1997–2000.

**Other Selected Awards**

♦ **Research Featured:** CWRU Home Page, College of Arts & Sciences Home Page & Campus News.

♦ **Travel Awards (Including from NSF):** For ● invited talk at *Developments and Challenges in Mixture Models, Bump-Hunting and Measurement Error Models,* 2002; ● talks at New Researchers' Conference, 1997 & 1999; ● invited talk at AMS-IMS-SIAM Joint Summer Research Conference in Mathematical Sciences, University of Washington, Seattle, WA, 1995.

♦ **Awards for Poetry:** ● Editor's Choice Award for Outstanding Achievement in Poetry, presented by *The National Library of Poetry, English poem* was published in Whispers at Dusk anthology by National Library of Poetry, 1997. ● A *Telugu* (South Indian Language) *poem* was published in Andhra University Magazine & received an award, March 1987.

♦ **Gold Medal:** Andhra University, India, for highest academic achievement, 1988.

## Invited/International Presentations

♦ **JSM 2006:** Joint Statistical Meetings, Seattle, WA, August 2006. Session on *Density-Based Clustering.*
*Mixture Model Building for High-Dimensional and Functional Data* [Presenter: Loader; joint work with Pilla].

---

[13]First time a faculty from the Department of Statistics, CWRU, is selected. Circumstances in the Department/College prevented acceptance of the award/fellowship.

*Ramani S. Pilla* 6

◆ **JSM 2005 (IMS Sessions):** Joint Statistical Meetings, Minnesota, MN, August 2005.
a–c in IMS Session on *Model Building via Mixtures: Recent Developments and Future Directions.*
(a.) *A New Technique for Finding Needles in Haystacks: A Geometric Approach to Distinguishing Between a New Source and Random Fluctuations* [Presenter: Taylor; joint work with Pilla].
(b.) *On a Flexible Information Criterion for Order Selection in Semiparametric Mixture Models* [Presenter: Charnigo; joint work with Pilla].
(c.) *Dynamic Mixture Modeling via Local Likelihood* [Presenter: Loader; joint work with Pilla].
(d.) *Asymptotic Theory for Testing Under a General Convex Cone Alternative for Correlated Data.* [Invited to present in Topic Contributed IMS Session *Nonparametric Function Estimation*].

◆ **IFNA/CSNA 2005:** Joint Annual Meeting of the Interface and the Classification Society of North America. Theme: *Clustering and Classification,* St. Louis, MO, June 2005.
(a.) *Searching High-Dimensional Parameter Spaces for a Parsimonious Mixture Model.*
(b.) *On a Flexible Information Criterion for Order Selection in Semiparametric Mixture Models* [Presenter: Charnigo; joint work with Pilla].

◆ **SRC 2005:** Twelfth Annual Spring Research Conference, Sponsored by IMS and Section on Physical and Engineering Sciences of ASA, Park City, Utah, June 2005.
*A Geometric Approach to Distinguish Between a New Source and Random Fluctuations: Applications to High-Energy Physics.*

◆ **IMS/ENAR 2005:** Institute of Mathematical Statistics/International Biometric Society Eastern North American Region, Austin, TX, March 2005.
*Local Likelihoods versus Local Mixture Likelihoods.*

◆ **Special Invited Session at ACAS 2004:** Army Conference on Applied Statistics, Atlanta, Georgia, October 2004.
(a.) *The Volume-of-Tube Formula: Applications to Perturbation and Mixture Models.*
(b.) *Perturbation Theory and Mixture Models: Application to Particle Physics* [Presenter: Taylor; joint work with Pilla].

◆ **6th BS/IMSC 2004 Meetings:** 6th World Congress of the Bernoulli Society for Mathematical Statistics and Probability and 67th Annual Meeting of the Institute of Mathematical Statistics, Barcelona, Spain, July 2004.
(a.) *The Volume-of-tube Formula and Perturbation Tests I: Complete Specification of the Null Model* [Contributed].
(b.) *The Volume-of-tube Formula and Perturbation Tests II: Nuisance Parameters Under the Null Model* [Contributed; Presenter: Loader; joint work with Pilla].

◆ **IMS/WNAR 2004:** Institute of Mathematical Statistics/International Biometric Society Western North American Region, Albuquerque, NM, June 2004.
*Testing for the Order of Mixture Models via Perturbation Theory.*

◆ **Interface 2004:** Security & Infrastructure Protection, 36th Symposium on Interface: Computational Biology and Bioinformatics, Baltimore, MD, May 2004.
*The Volume-of-Tube Formula: Applications to Perturbation and Mixture Models.*

◆ **Interface 2003:** Security & Infrastructure Protection, 35th Symposium on Interface: Computing Science and Statistics, Salt Lake City, Utah, March 2003. Invited to speak in the **Best of J. of Computational & Graphical Statistics** session, Salt Lake City, Utah, March 2003.
*Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixtures.*

♦ **IISA 2002:** Fourth Biennial International Conference on Statistics, Probability & Related Areas, Northern Illinois University, Dekalb, IL, June 2002.
   *Fitting Mixtures of Multivariate Distributions via Penalized Dual Method.*

♦ **MBHMEM 2002:** Developments and Challenges in Mixture Models, Bump-Hunting and Measurement Error Models, Cleveland, June 2002.
   *Fitting Mixtures of Multivariate Distributions via Penalized Dual Method.*

♦ **IMS/ENAR 2002:** Institute of Mathematical Statistics/International Biometric Society Eastern North American Region, VA, March, 2002.
   *On Semiparametric Mixture Approach for Repeated Ordinal Data.*

♦ **Mixtures 2001:** Recent Developments in Mixture Modeling, Hamburg, Germany, July, 2001.
   (a.) *An Adaptive Spatial Scan Density Estimation Method via Semiparametric Mixture Models.*
   (b.) *On Several Parameterizations for Improving Convergence of EM Algorithm in Mixtures.*

♦ **Classification Society of North America:** St. Louis, MO, June, 2001.
   *On Image Analysis via Mixture Models: Application to Automatic Target Recognition.*

♦ **NC 2000:** Second International ICSC Symposium on Neural Computation, Technical University of Berlin, Germany, May, 2000.
   *Assessing Convergence of an Iterative Algorithm: Application to Neural Networks.*

♦ **New Researchers' Conference:** Baltimore, MD, August 1999.
   *Likelihood-Based Inference for Random Effects Models with Binary Response.*

♦ **Alumni Workshop:** Pennsylvania State University, PA, March 1999.
   *Likelihood-Based Inference for Random Effects Models with Binary Response.*

♦ **New Researchers' Conference:** Laramie, WY, July 1997.
   *New Data Augmentation and its Consequences in High-Dimensional Mixtures.*

♦ **AMS-IMS-SIAM 1995:** Joint Summer Research Conferences in Mathematical Sciences, University of Washington, Seattle, WA, July 1995.
   *Conjugate Gradient Related Methods: Application to Neural Networks.*

## Invited Lectures and Seminars

### 2007

♦ *Model Selection and Consistent Estimation in Semiparametric Mixtures,* Department of Biostatistics & Medical Informatics, **U. Wisconsin, Madison**, March.

♦ *On a Flexible Information Criterion for Order Selection in Semiparametric Mixture Models,* Department of Statistics, **U. South Carolina, Columbia**, February.

### 2006

♦ *Semiparametric Inference for Correlated Data,* Department of Statistics, **Stanford University**, July.

♦ *A Geometric Approach to Distinguish Between a New Source and Random Fluctuations.*
   (a.) Department of Physics, **University of Oxford**, UK. May.
   (b.) Particle Physics Department, **Rutherford Appleton Laboratory**, part of Council for the Central Laboratory of the Research Councils, Oxfordshire, OX, UK. May.
   (c.) **Statistical and Applied Mathematical Sciences Institute** (SAMSI), Research Triangle Park, NC. March.
   (d.) **Stanford Astronomy-CSSA-KIPAC-SLAC (ACKS) Seminar.** January. [Note: KIPAC-Kavli

Institute for Particle Astrophysics and Cosmology; SLAC-Stanford Linear Accelerator Center; CSSA-Center for Space Science and Astrophysics]

◆ *Inference in Perturbation Models, Mixtures and Spatial Scan Process.*
  (a.) Department of Statistics, **University of Oxford**, UK. May.
  (b.) Department of Statistics, **Florida State University**, March.
  (c.) Department of Statistics, **UCLA**, February.
  (d.) Department of Statistics, **UC, Irvine**, February.
  (e.) Department of Mathematics and Statistics, **Boston University**, February.
  (f.) Department of Statistics, **Stanford University**, January.

**2005**

◆ *On a Flexible Information Criterion for Order Selection in Semiparametric Mixture Models*, Department of Biostatistics & Medical Informatics, **U. Wisconsin, Madison**, October.

◆ *The Volume-of-Tube Formula: Perturbation Tests, Mixture Models, Scan Statistics and Applications*, Department of Statistics, **U. Wisconsin, Madison**, October.

◆ *A Geometric Approach to Distinguish Between a New Source and Random Fluctuations: Applications to High-Energy Physics.*
  (a.) **New Mexico State University**, April.
  (b.) Statistical Science Group, **Los Alamos National Laboratory**, April.
  (c.) **Center for Education and Research in Cosmology and Astrophysics (CERCA)** Seminar, CWRU, Department of Physics, February. [**CERCA** is organized around research programs in cosmology and astrophysics, Department of Physics at CWRU in association with Department of Astronomy and Cleveland Museum of Natural History.]

◆ *Testing for the Order of Mixture Models via Perturbation Theory*, Department of Statistics, **University of New Mexico**, April.

**2004**

◆ *Inference in Mixture Models*, Department of Biostatistics and Department of Statistics, **U. of Pennsylvania**, November.

◆ *Testing for the Order of Mixture Models via Perturbation Theory.*
  (a.) Department of Statistics, **U. of Kentucky**, October.
  (b.) Department of Statistics, **Ohio State U.**, April.

**2003**

◆ **Public Lecture:** *Mixture Models and their Applications to Bioinformatics and Image Analysis*[14], Department of Biology, CWRU, November.

◆ *Inference in Mixture Models*, Department of Epidemiology and Biostatistics, CWRU, November.

◆ *The Volume-of-Tube Formula: Applications to Perturbation and Mixture Models.*
  (a.) Department of Applied Mathematics & Statistics, **Johns Hopkins University**, November.
  (b.) Department of Mathematics & Statistics, **York University**, October.

**2002**

◆ *Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixtures.*
  (a.) Department of Statistics, **Oregon State University**, May.
  (b.) Department of Statistics, CWRU, February.

---

[14]Outreach lecture in an effort to build bridges with allied fields.

♦ *Testing for Ordered Group Means in Random Effects Models.* Department of Health Studies & Department of Statistics, **University of Chicago**, Joint Seminar, January.

**1999–2001**

♦ *Mixtures in the Context of Image Analysis,* **Naval Surface Warfare Center**, VA, August, 2001.

♦ *Moment-Based Approximations of Distributions Using Mixtures: Theory and Applications,* **Free University of Berlin, Institute for Social Medicine**, Berlin, Germany July.

♦ *Testing for Ordered Group Means in Random Effects Models,* Department of Mathematics, Statistics & Computer Science, **University of Illinois, Chicago**, March.

♦ *Testing for Ordered Group Means in Random Effects Models,* at **Cornell U.; Texas A & M U.; U. North Carolina, Chapel Hill; U. Texas at Houston; Bowling Green State U.**; 2000

♦ **Outreach Lecture:** *Why a Career in Mathematical Sciences,* to group of female math majors training in a summer program at *George Washington University.* **One of two speakers chosen by** Office of Science Education Division at the **National Institutes of Health**, July, 1999.

**1993-1997**

♦ *Improving the Rate of Convergence of EM in High-Dimensional Finite Mixtures,* at **Yale U.; Johns Hopkins U.; U. of California, Los Angeles; U. Minnesota; U. California at Santa Barbara**; Hershey Medical Center, Pennsylvania State U.; National Institute of Child Health and Human Development, National Institutes of Health; 1998–1997

♦ *Moment-Based Approximations of Distribution Using Mixtures,* Department of Statistics, **Andhra University, India**, December, 1993.

## Teaching and Related Experience

**Courses Planned, Developed and Taught** (With 100% Responsibility)

At **Case Western Reserve University**                                         Fall 2002–Present

♦ Spring 2007: ***Statistical Methods for Scientific Research*** [BIOL/PHYS 561][15]. Proposed and developed a special topics inter-disciplinary course tailored to statistics, biology, physics and engineering graduate students with emphasis on both theory and applications.

♦ Fall 2006: ***Statistics for Engineering & Science*** [STAT 312]. For advanced UG students in engineering, physical and life sciences based on "Probability & Statistics for Engineers & Scientists" by Walpole, Myers, Myers & Ye.

♦ Spring 2005: ***Linear Models*** [STAT 455]. An advanced M.S./Ph.D. course based on "Plane Answers to Complex Questions" by Christensen.

♦ Fall 2004: ***Advanced Topics in Statistics: Inference*** [STAT 571]. Developed a new special topics course for Ph.D. students. Utilized Splus and Mathematica modules I developed for the research.

♦ Spring 2003 and Spring 2005: ***Theoretical Statistics II*** [STAT 346/446–EPBI 482] based on "Statistical Inference" by Casella & Berger—for U.G./graduate students from various disciplines including biostatistics/statistics. Utilized Mathematica, MathStatica and other web-based modules I developed.

♦ Fall 2005, Fall 2004 & Fall 2002: ***Theoretical Statistics I*** [STAT 345/445–EPBI 481] based on "Statistical Inference" by Casella & Berger—for U.G./graduate students from various disciplines

---

[15]Course had over 12 graduate students enrolled. It was unprecedented to have such a high enrollment for a special topics course, especially first time.

including biostatistics/statistics. Utilize Mathematica, MathStatica and other web-based modules I developed.

♦ Fall 2002: *Advanced Theory of Statistics I* [STAT 545] based on "Elements of Large Sample Theory" by Lehmann—for Ph.D. students in biostatistics/statistics. Utilized Splus, Mathematica and other software modules I developed.

At **University of Illinois**, Chicago                                                Fall 2000–2001

♦ Fall 2001: *Advanced Statistical Inference* [BSTT 531] **same as STAT 545 above** based on "Elements of Large Sample Theory" by Lehmann—for Ph.D. students in biostatistics/statistics. **First time to be offered in college.** Utilized Splus, Mathematica and other software modules I developed.

♦ Fall 2001: *Biostatistical Methods I* [BSTT 502] based on "Fundamentals of Biostatistics" by Rosner; "Applied Linear Statistical Models" by Neter, Kutner, Nachtsheim & Wasserman—for M.S./Ph.D. students from various disciplines. Utilized SAS & web resources.

♦ Spring 2001: *Generalized Linear Models* [BSTT 594A] based on "Generalized Linear Models" by McCullagh & Nelder—for Ph.D. students in biostatistics/statistics. **First time to be offered at campus.** Utilized SAS, Splus and other software modules I developed.

At **Pennsylvania State University**                                          Summer 1993–Fall 1997

♦ Fall 1996 & Fall 1997: *Applied Regression Analysis* [STAT 462] based on "Applied Linear Regression Models" by Neter, Kutner, Nachtsheim & Wasserman; "Classical and Modern Regression with Applications" by Myers—for senior U.G./graduate students.

♦ Summer 1994–Spring 1996: *Applied Statistics* [STAT 451] based on "An Introduction to Statistical Methods and Data Analysis" by Ott—for U.G./graduate students from other disciplines.

♦ Summer 1993: *Introduction to Probability Theory* [MATH/STAT 414] based on "Probability and Statistical Inference" by Hogg & Tanis—for senior U.G. students.

## Advisory/Mentoring Experience

At **Case Western Reserve University**                                         Fall 2002–Present

♦ **RIBMS Faculty Mentor:** A faculty mentor in the Research at the Interface of the Biological & Mathematical Sciences (RIBMS), funded by NSF; a program for UG students majoring in biology, mathematics or statistics working on research problems at the interface of biological and mathematical sciences. Details at http://www.case.edu/artsci/ribms/ribms.html.

♦ **M.S. Thesis Advisor and B.S. Academic Advisor:** M. Blevins, combined B.S.-M.S. in Statistics. • On M.S. (Statistics) thesis entitled *Bayesian Measures of Model Complexity for Structure Learning* since Fall 2005, graduated in August 2006. Currently at Brown University. • On STAT 651–M.S. Thesis Research Spring 2006 (6cr). • During her B.S., graduated with B.S. (Statistics) May 2005. Secured 10 week internship in Summer 2005, *Department of Energy* operated, Office of Science funded Science Undergraduate Laboratory Internship (SULI) program, at *Pacific Northwest National Laboratory*, Richland, WA.

♦ **Advisor for Research Assistant:** • M. Blevins on creating web tools, Matlab and Mathematica functions on Pilla's research monograph. • G. Xing on *Fitting Mixture Models*, Summer 2003—Summer 2004 and on STAT 601–*Reading and Research Course*, Fall 2003 (1cr) and Spring 2004 (3cr). Presented his research at the *Joint Statistical Meetings*, Toronto in August 2004.

♦ **Mentor:** Have been mentoring • Francisco Vera (Clemson University) and initiated projects on mixture models. • R. Charnigo (University of Kentucky) and initiated projects while he was a Ph.D. Candidate and continuing.

◆ **Ph.D. Dissertation Committees:** • D. Kitska; dissertation entitled *Simultaneous Inference for Functional Linear Models*; graduated in Fall 2004. • R. Charnigo; dissertation entitled *Testing Homogeneity in Finite Mixtures and a Semi-Local Paradigm for Wavelet Denoising*; graduated in Summer 2003; currently at U. of Kentucky.

At **University of Illinois, Chicago**      Fall 2001–Summer 2002

◆ **Faculty Advisor:** Supervised four M.S. students: N. Huang, H. Kim, Y. Li & Q. Zou.

At **National Institutes of Health**      Spring 1998–Summer 2000

◆ **Graduate Student Advisor:** Directed and mentored P. Tao, Ph.D. Candidate at Johns Hopkins University, on the project entitled *Application of Borrowed Strength Density Estimation to Image Recognition Problems*.

At **Pennsylvania State University**      Summer 1995

◆ **U.G. Research Advisor:** Directed and trained S. Parks on *Application of Mixtures to Positron Emission Tomography* under Research Experience for undergraduate program sponsored by NSF.

## Research and Other Experience

### Collaborative and Consulting Experience

At **Case Western Reserve University**      Fall 2002–Present

◆ Scientists in School of Medicine; Departments of Biology and Physics in College of Arts & Sciences.

At **National Academies**[16]      Spring 2001–Summer 2002.

◆ Examined and evaluated scientific reasons for the prevalence of suicide clusters via mixture models.

At **National Institutes of Health**      Fall 1998–Fall 2000

◆ Established collaborations with researchers at National Institute of Child Health & Human Development on several projects. Created and developed statistical models as well as directed and co-organized the analysis of data from the World Health Organization, interpretation of fitted models and presentation of research in scientific meetings and peer reviewed journals.

At **Pennsylvania State University**      Fall 1991, Spring 1992 & Summer 1995

◆ Advised several faculty and students from several different departments in various colleges on statistical analysis. Applied numerical analysis based methods to assess and predict convergence behavior of nonlinear sequences through the applications.

### Software Developed      Summer 1993–Present

◆ **QIF-LIB:** An S-Plus library for fitting the *Quadratic Inference Functions* via the Iterative Reweighted Generalized Least Squares algorithm (with C. Loader).

◆ **FLIC-LIB:** An R/S-Plus library for fitting semiparametric mixture models via the *Flexible Information Criterion* (with R. Charnigo).

◆ **MULTV-PD:** A Matlab library for *Fitting Multivariate Mixture Models using Penalized Dual Method* (with F. Bartolucci).

◆ **MATH-FDMIX:** A Mathematica library for *Flexible Fitting and Diagnostics of Finite Mixture Models* (with C. Loader).

◆ **MATLAB-FDMIX:** A Matlab library for *Flexible Fitting and Diagnostics of Finite Mixture Models* (with G. Xing).

---

[16]Comprises of: National Academy of Sciences, National Academy of Engineering, Institute of Medicine and National Research Council.

♦ **ASSA-MIX:** An S-Plus library and C programs for *Adaptive Methods for Spatial Scan Analysis via Semiparametric Mixture Models* (with P. Tao).
♦ **MLE-LGM:** A FORTRAN library for *Finding the MLE in Logistic-Gaussian Models via an Alternative EM Algorithm.*
♦ **AEM-FMIX:** A FORTRAN library for *Alternative EM Methods in Finite Mixtures*—to improve the rate of convergence of EM in high-dimensional finite mixtures.
♦ **AUGM:** A FORTRAN library for *Approximation Using Gamma Mixtures*—to fit targeted distributions with mixtures of distributions in calculating tail probabilities.

## Professional Service

♦ **Adhoc NSF Proposal Reviewer:** Directorate for Geosciences and Division of Mathematical Sciences–Collaborations in Mathematical Geosciences Program, NSF, April 2004.
♦ **Reviewer for Journal Articles:** Canadian J. of Stat.; Comp. Stat. & Data Analysis (CSDA); IEEE Transactions on Neural Networks; IEEE Signal Processing Letters; J. Amer. Stat. Assoc. Theory and Methods; J. Amer. Stat. Assoc. Applications & Case Studies; J. Computational & Graphical Statistics; J. Educational & Behavioral Stat.; J. Stat. Plan. & Inference; Special Issue-CSDA on Mixtures 2003 & 2006; Statistics in Medicine; Technometrics.

### Invited Session Organizer

♦ **JSM 2005:** Joint Statistical Meetings, Minneapolis, MN, August 2005. An IMS Session on *Model Building via Mixtures: Recent Developments and Future Directions.*
♦ **IFNA/CSNA 2005:** Joint Annual Meeting of the Interface and the Classification Society of North America. Theme: *Clustering and Classification,* St. Louis, MO, June 2005. Session on *Model Building with Applications to Mixtures and Bioinformatics* [Co-organized with C. Loader].
♦ **IMS/ENAR 2005:** IMS/ENAR, Austin, TX, March 2005. IMS Session *To Mix or Not To Mix.*
♦ **ACAS 2004:** Army Conference on Applied Statistics, Atlanta, GA, October 2004. Session on *The Volume-of-Tube Formula: Perturbation, Mixture Models and Applications.* [Co-organized with C. Loader.]
♦ **Interface 2004:** 36th Symposium on the Interface, Computational Biology & Bioinformatics, Baltimore, MD, May 2004. Session on *Functional Data Analysis for Computational Biology.* [Co-organized with C. Loader.]
♦ **IMS/ENAR 2003:** International Biometric Society Eastern North American Region, Tampa, FL, March, 2003. Session on *Clustering and Mixtures with Applications to Spatial Models and Image Analysis.* [One of only seven IMS invited sessions selected for ENAR.]

### Invited Session Chair

♦ **JSM 2005:** Joint Statistical Meetings, for an IMS Session on *Model Building via Mixtures: Recent Developments and Future Directions.*
♦ **IMS/ENAR 2003:** International Biometric Society Eastern North American Region, Tampa, FL, March 2003. Session on *Clustering and Mixtures with Applications to Spatial Models and Image Analysis,* sponsored by IMS.
♦ **IMS/ENAR 2002:** International Biometric Society Eastern North American Region, VA, March, 2002. Session on *Some Recent Developments and Applications of Random Partition Distributions,* sponsored by IMS.

♦ **MIXTURES 2001:** Hamburg, Germany, July 2001, for an *Invited Session*.

♦ **JSM 1997:** Joint Statistical Meetings, Anaheim, CA, August 1997. Session on *Computational Innovations*.

**Professional Affiliations and Organizations**

♦ American Assoc. for Advancement of Science; American Statistical Assoc.; Bernoulli Society; Inst. of Mathematical Statistics; Int. Assoc. for Statistical Computing; Int. Biometric Society & ENAR.

**Committees and Other**

♦ Organized (jointly with Loader & Koonce) Distinguished Professor Bruce Lindsay's visit to CWRU for Mini Research Symposium with System Biologists, Summer 2004.

♦ *Program Committee Member*, Interface 2005 & 2004.

♦ Computing Committee, NICHD, **National Institutes of Health**, Spring 1998–Fall 2000.

## University Service

♦ **RIBMS Steering Committee:** Member of the steering committee that oversees the development and organization of the Research at the Interface of the Biological & Mathematical Sciences (RIBMS), funded by NSF.

♦ Case **Welcome Days Invited Speaker**[17]: Director, Educational Enhancement Programs at CWRU invited to lead a *Meet the Faculty* seminar during Case Welcome Days Orientation for Freshmen, August 2005 & August 2006. Chosen Topic: *From Atoms to Galaxies, and Everything in Between: The Statistical Meaning of It All.*

♦ **Dean's Committee for Department of Statistics Chair Search:** CWRU, Fall 2002–Spring 2004.

♦ **Chair of Colloquium Series:** Department of Statistics, CWRU, Spring 2003.

♦ **Proposal to the Dean of College of Arts & Sciences, CWRU:** To *secure additional graduate assistantships for the department* for Fall 2003. [Secured Three.]

♦ **Graduate Admissions Committee:** Department of Statistics, CWRU, Spring 2003.

♦ **Ph.D. Comprehensive Examination Committee:** Department of Statistics, CWRU, Spring 2003.

♦ **Proposal for Ph.D. Qualifying Exam Guidelines:** Department of Statistics, CWRU, Fall 2002.

♦ **Langenberg Award Committee:** Honors College, *U. Illinois*, Chicago, 2002. This award is given to an outstanding U.G. woman or minority student majoring in mathematics, statistics or natural sciences and intending to purse graduate studies in one of these fields.

♦ **Statistics Seminar Organizer:** Division of Epidemiology & Biostatistics, *U. Illinois, Chicago*, Spring 2001–Summer 2002.

♦ **Ph.D. Curriculum Development Committee:** Division of Epidemiology & Biostatistics, *U. Illinois*, Chicago, 2001–2002.

♦ **M.S. and Ph.D. Qualifying Examination Committees:** Division of Epidemiology & Biostatistics, *U. Illinois*, Chicago, Fall 2000–Spring 2002.

♦ **Web Development Committee:** Division of Epidemiology & Biostatistics, *U. Illinois*, Chicago, Spring 2001–Spring 2002.

2007

---

[17]First faculty from statistics to be invited.